Willie Edward MORRIS *v.* STATE of Arkansas

CR 06-287                                                240 S.W.3d 593

Supreme Court of Arkansas
Opinion delivered October 5, 2006

*William R. Simpson, Jr.*, Public Defender, *Brett Qualls*, Deputy Public Defender, by: *Clint Miller*, Deputy Public Defender, for appellant.

*Mike Beebe*, Att'y Gen., by: *Farhan Khan*, Ass't Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice. In August 2005, Appellant Willie Edward Morris was tried before a jury and convicted of the rape and kidnapping of L.L., a teenage girl. At trial, the State was allowed to introduce evidence concerning the rape and kidnapping of another victim, A.T., pursuant to Ark. R. Evid. 403 and 404(b) (2006). Morris was convicted on both charges, and because Morris was a habitual offender with two previous violent felony convictions, he was sentenced to life imprisonment for the rape conviction and to a thirty (30) year sentence for the kidnapping conviction, to be served concurrently with the life sentence. Morris appeals from his convictions, raising one point on appeal — that the trial court erred in his trial for the offenses committed against L.L. when it allowed the prosecution to introduce evidence concerning the rape and kidnapping of A.T. pursuant to Ark. R. Evid. 403 and 404(b). We find no error and affirm.

On the afternoon of Tuesday, February 10, 2004, L.L. who lived in the Hillcrest area of Little Rock, arrived home from school and, after spending some time at home, left her house to purchase

a Coke from the Kroger on nearby Beechwood street. On her way to and from the store L.L. used a shortcut that lead through an alleyway, which ran between a wall of the Pulaski Heights Methodist Church and a series of backyards. On her way home, while she was cutting through the alleyway, L.L. was stopped by a man who grabbed her arm and asked her to come with him. She refused to accompany him, and the man allegedly said "don't make me hurt you" while indicating that he had something concealed in his pocket, which L.L. believed to be a gun. The man pulled L.L. further back down the alleyway into a recess in the wall, and he began asking her questions such as her age, her name, and where she lived. He then touched L.L.'s breasts and forced her to perform oral sex on him, stating that if she complied he would let her go home and that he wouldn't hurt her. After she performed oral sex on him for approximately 10 minutes he released her, and she ran home; he did not ejaculate when he raped her. The assault allegedly occurred around 6 or 7 p.m., and the entire encounter lasted approximately twenty minutes. Upon arriving home, L.L. told her younger sister about the assault and called the police. However, while waiting for the police to arrive, L.L. called a friend and left home; thus, she did not file an official report with the police at that time. She also did not tell her parents what happened that day.

On Sunday, February, 15, 2004, at approximately 1 p.m., L.L. decided to leave her house and walk back to the Kroger in an effort to "face her fears." During her walk, L.L. saw the same man who had assaulted her five days before. The man began following her, slowly gaining on her. When he came within approximately ten feet of her, L.L panicked and walked into the street, hailing a woman in a car, who then took her home. L.L. did not get any contact information from the woman who drove her home and when she arrived home, L.L. ran into the house and told her father what happened. L.L. and her parents then called the police, this time giving a full report of the events of February 10 and 15.

L.L. identified her assailant to police as a tall black male, who was approximately 30 years old with medium skin, full lips, a protruding jaw, and a light mustache and facial hair. L.L. also stated that the man was wearing a hunter-green windbreaker jacket, jeans, and a dark baseball cap that was either black or navy blue. L.L. later picked Appellant Morris out of a photo line-up con-

ducted by the Little Rock Police. L.L. was 16 years old at the time of the assault; she was approximately 5 feet tall, weighed 100 pounds, and had blonde hair.

On February 26, 2004, in the Ridge Road area of North Little Rock, A.T. was dropped off at her bus stop and began walking home by her usual route. She crossed paths with a man who showed her a gun and told her to turn around and walk with him. A.T. began walking with the man out of fear, assuming that if she complied with his wishes he would let her go unharmed. While they walked together, the man asked A.T. questions, such as when her parents got home, what her name was, whether she had a boyfriend, and where she lived. As the two began walking towards A.T.'s house, A.T. noticed that a white "box-like" car was parked near her house. The man asked A.T. to take a ride in the car with him, but she refused and began crying. He told A.T. that if she did not stop crying he would have to take his gun out and, if she just walked another block with him, he would let her go home.

The man then took A.T. to an area behind her house that was not visible from the street. There, he fondled A.T.'s breasts, forced her to perform oral sex on him, and raped her vaginally. He did not ejaculate when he raped A.T. After he was finished, he let A.T. go, telling her if she told anyone what happened, he would return and kill her. A.T. ran home and called her parents, who then reported the assault to the police.

A.T. described her assailant as a very tall, black man, who had slight facial hair. She described the man's clothing as a greenish jacket and khaki pants. The North Little Rock police showed A.T. the same photo line-up that L.L. had seen and she identified Morris as her assailant. At the time of the assault A.T. was approximately 5 feet tall, weighed 90 pounds, and had blonde hair.

On March 2, 2004, Detective B.T. Carmichael of the North Little Rock Police Department was assigned to perform surveillance in an unmarked car in the area of Ridge Road. He had received a BOLO (be on the lookout) for a suspect meeting A.T.'s description of her assailant and his car. At around 4 p.m. he noticed a white older model BMW being driven by Morris that appeared to be following a school bus. Carmichael began following the car after he determined that the vehicle conformed with the BOLO. Noticing that the vehicle did not have a license plate, Carmichael radioed a marked patrol to stop the car under the pretense of not

having a license. Morris was informed that his car met the description of a car used in a recent crime in the area, and, therefore, the officers wanted to talk to him. Morris then went to the police department willingly.

At the North Little Rock Police Department, Morris was interviewed and advised of his *Miranda* rights by Detective Michael Gibbons. Upon being informed that the interview was part of an investigation into the rape of A.T., Morris repeatedly denied being involved and gave an alibi for being in the Ridge Road area at the time he was picked up. He eventually left the station of his own accord. Meanwhile, Morris's car was impounded by the North Little Rock police on various traffic violations. Gibbons obtained a search warrant for the car and found a plastic toy gun, a couple of baseball caps, and a receipt from the Kroger on Beechwood, dated February 27, 2004. That same evening, A.T. identified Morris via the photo-lineup, and Gibbons obtained a warrant for his arrest.

Morris was arrested on March 3, 2004, and brought into the North Little Rock Police Department, where Gibbons executed a search warrant on Morris's person and tried to obtain blood, saliva, and hair samples for DNA testing. According to Gibbons, Morris had shaved his facial hair, trimmed the hair on his head, and shaved his pubic hair since the day before. This complicated Gibbons's attempts to obtain a sufficient DNA sample of Morris's pubic hair, and the DNA testing results comparing Morris's hair with hair found in A.T.'s rape kit were inconclusive. While Gibbons was preparing paper work concerning the DNA search, Morris began crying and kept making comments to Gibbons, saying things like "why was he doing this to him," and "it was going to ruin his life, marriage, everything." Morris then insisted that he wanted to talk to Gibbons about the situation, and after being re-*Mirandized* he made another statement to Gibbons. In the statement, Morris asserted that he had met up with a girl on Ridge Road, but that he had not forced her to do anything. However, when Gibbons accidentally disclosed the fact that the victim was only 14, Morris quit talking and requested to speak to an attorney, and the interview concluded.

Later that day, Morris was transferred to the Little Rock Police Department so that Little Rock police could question him with regard to the rape of L.L. At the Little Rock department, Detective Jason Follett informed Morris that he was suspected of committing a rape in Little Rock and began reading Morris his

*Miranda* rights. It was at this point that Morris spontaneously stated, "he did not rape that woman," and that the police did not have his DNA and could not convict him without DNA. Follett then proceeded to finish reading Morris his *Miranda* rights, and Morris said he did not want to say anything else and requested an attorney.

Before trial, Morris filed a motion in limine to exclude the introduction of evidence concerning the rape of A.T. in the trial for the rape of L.L., alleging that to allow this evidence to be admitted would be contrary to the Arkansas Rules of Evidence and would violate his due process rights under the Fourteenth Amendment to the U.S. Constitution. Morris renewed his motion at the preliminary hearing on February 22, 2005. After hearing arguments from counsel regarding the admissibility of the evidence in the trial for L.L.'s rape, the court denied Morris's motion in limine. The circuit court concluded that the evidence would be admissible to show plan, scheme, motive, preparation and intent, pursuant to Ark. R. Evid. 404(b), but not to show Morris's propensity to commit rape.

At the trial, Morris renewed his motion to exclude the evidence, and, again, his motion was denied. The State was allowed to admit A.T.'s testimony about the rape and the testimony of the officers who first made contact with Morris as a suspect in A.T.'s rape. The officers' testimony included details, such as what was found in Morris's car when he first made contact with police and details that corroborated the victims' identifications of Morris. At the conclusion of the trial, Morris proffered a jury instruction pursuant to Rule 404(b) that would have only allowed the jury to consider that testimony as proof of motive and intent. The circuit court refused to submit the proffered instruction to the jury; instead, the court adopted the State's proffered instruction, which allowed the jury to consider the evidence as proof of plan, scheme, motive, intent and preparation.

On appeal, Morris argues that the evidence concerning the rape of A.T. should have been excluded under Rule 404(b) because the evidence did not have any "independent relevance" other than to show his propensity to commit rape. He also challenges the admissibility of the evidence under Rule 403, arguing that because the evidence had no other probative value than to prove his propensity to commit rape, its prejudicial effect outweighed any probative value.

## I. Ark. R. Evid. 404(b)

Arkansas Rule of Evidence 404(b) allows evidence of other crimes, wrongs, or acts to be admitted for the purpose of showing such things as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." However, evidence is not admissible under Rule 404(b) to show a defendant's bad character traits and to show he acted in conformity therewith in the case at bar. For evidence to be admissible under Rule 404(b), it must have independent relevance. *Carter v. State*, 295 Ark. 218, 748 S.W.2d 127 (1988).

Evidence admitted under 404(b) is independently relevant if it has a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *Williams v. State*, 343 Ark. 591, 36 S.W.3d 324 (2001). Any circumstance that ties a defendant to the crime or raises a possible motive for the crime is independently relevant and admissible as evidence. *Jackson v. State*, 359 Ark. 297, 197 S.W.3d 468 (2004). We have allowed evidence of other similar crimes to be admitted under Rule 404(b) to show that a defendant committed the particular crime in question; however, the standard for admission of evidence under Rule 404(b) is different from the standard for admission of evidence under the doctrine of *modus operandi*, which requires a greater degree of similarity between the crimes. *See Sasser v. State*, 321 Ark. 438, 902 S.W.2d 773 (1995). Admission of extrinsic acts under Rule 404(b) does not need to be "as extensive or striking as is required to show *modus operandi*." *Id.* at 447, 902 S.W.2d at 779 (citing 2 Jack B. Weinstein, et al., *Weinstein's Evidence* ¶ 404[12] (1995)).

As with other evidentiary determinations, the balancing of the probative value against prejudicial effect is a matter left to the trial court's sound discretion, and we will not reverse the trial court absent a showing of a manifest abuse of discretion. *Id.*; *Jackson v. State, supra.* "The degree of similarity between the circumstances of prior crimes and the present crime required for admission of evidence under Rule 404(b) is a determination that affords considerable leeway to the trial judge, and may vary with the purpose for which the evidence is admitted." *Id.* at 447, 902 S.W.2d at 778.

One recent case, *Fells v. State*, 362 Ark. 77, 207 S.W.3d 498 (2005), presented this court with a situation similar to the case at hand, and is therefore instructive here. In *Fells*, the defendant was

charged with the rape of S.H., and the circuit court allowed the State to present testimony from R.B., another victim who was raped by Fells. In examining the two rapes, we found the following similarities: (1) In both cases, Fells drove around low income areas and, upon seeing women with nowhere else to go, called them over to his car on the pretense that he thought they were someone else; (2) Fells made small-talk with both women for about thirty minutes and during the conversation discovered their needs, such as a job or a meal; (3) Fells portrayed himself as charming and trustworthy to both women; and (4) When both victims resisted his advances, Fells used his knowledge of their vulnerabilities to his advantage, telling one victim that he would tell her boyfriend and telling the other pregnant victim that he would leave her in a remote area. *Id.* We affirmed the circuit court's action, holding that because of the similar circumstances surrounding the two rapes, the testimony of the first victim was admissible to show Fells's motive, intent, and plan to rape S.H. *Id.*

We have also upheld the admission of evidence under 404(b) in a variety of other situations where the prior bad acts of the defendant bore substantial similarities to the case in which the evidence was introduced. *See Davis v. State*, 362 Ark. 34, 207 S.W.3d 474 (2005) (evidence that youth minister made sexual advances toward a church member admissible to show that his forced sexual interaction with another church member was not consensual); *Burmingham v. State*, 342 Ark. 95, 27 S.W.3d 351 (2000) (evidence of similarities in way rape of first victim was perpetrated was admissible to show similar scheme and intent when rape of second victim was committed); *Sasser v. State*, 321 Ark. 438, 902 S.W.2d 773 (1995) (testimony of first victim, a convenience store clerk, regarding defendant's rape and attempted murder of her was admissible to prove defendant's intent to kill a second convenience store clerk several years later).

Here, in light of our holding in *Fells* and based upon the degree of similarity between the circumstances surrounding L.L. and A.T.'s rapes, we cannot say that the circuit court abused its discretion by admitting the evidence of A.T.'s rape pursuant to Rule 404(b). Both victims were close in age and similar in appearance. Morris assaulted both victims near their homes during the hours of 4–6 p.m. Both victims were pulled into an area with low visibility from the road and were asked to perform oral sex. Also, Morris asked both victims similar questions, such as their age,

name and where they lived. He also indicated to both L.L. and A.T. that he had a weapon and would harm them if they did not comply with his wishes.

The similarities between the rape of A.T. and the case at hand are sufficient to show that Morris not only acted with the motive and intent to rape L.L., but that he also followed a similar plan, preparation, and scheme when perpetrating the crimes. He assaulted similar victims by accosting them in areas where they frequently traveled and at the same time of the day — the early evening hours, a time period that would ensure that the parents of school-aged girls would not be home from work — while indicating that he had a weapon and that the victims would be harmed if they did not comply with his wishes. We therefore hold that the circuit court did not abuse its discretion in allowing the State to introduce evidence of Morris's other crimes in the instant case, as proof of motive, intent, preparation, plan, and scheme pursuant to Rule 404(b).

## II. Ark. R. Evid. 403

Finally, we address Morris's argument that the circuit court erred by admitting the evidence regarding A.T.'s rape because the danger of unfair prejudice substantially outweighed its probative value. When reviewing a circuit court's ruling under Rule 403 we apply an abuse-of-discretion standard. *Flanery v. State*, 362 Ark. 311, 208 S.W.3d 187 (2005). In reviewing a circuit court's ruling under Rule 403, we have noted that "it is likely that evidence offered by the state will be prejudicial to the accused, or it probably would not be offered," but evidence should not be excluded unless the accused can show that the evidence lacks probative value in view of the risk of unfair prejudice to the defendant. *Beed v. State*, 271 Ark. 526, 542, 609 S.W.2d 898, 909 (1980). In the instant case, despite the apparent prejudice to Morris, the similarities between the crimes against L.L. and A.T. are sufficient to make this evidence probative on the issue of Morris's motive, intent, preparation, plan, and scheme. Considering the broad discretion of the circuit court in weighing the probative nature of the challenged evidence against its prejudicial effect, we cannot say that the circuit court here abused its discretion when it allowed the evidence to be admitted under Rule 403.

### III. Rule 4-3(h) Review

In compliance with Ark. Sup. Ct. R. 4-3(h), the record has been examined for all objections, motions and requests made by either party that were decided adversely to Morris, and no prejudicial error has been found. *Doss v. State*, 351 Ark. 667, 97 S.W.3d 413 (2003).

Affirmed.

HANNAH, C.J., dissents.

JIM HANNAH, Chief Justice, dissenting. I respectfully dissent for the reasons set out in my previous dissents and concurrences.[1] I also note my concern on particular issues in this case. First, I am concerned that based on the analysis in this case on Rule 404(b), *modus operandi* will be relegated to the evidentiary dustbin because it is difficult to imagine any prosecutor who will now resort to the more stringent requirements of *modus operandi*. Second, I am deeply concerned by the perfunctory review of the weighing of probative value against prejudicial harm. The prejudice resulting from admission of evidence of the guilt in another crime is overwhelming, and the analysis should be rigorous and thorough. Expecting a jury to simply ignore such evidence has been described as expecting "a measure of dispassion and exactitude beyond mortal capabilities." *United States v. Daniels*, 770 F.2d 1111, 1118 (D.C. Cir. 1985). If the prejudicial harm is overwhelming, then at the least, the probative value must be more overwhelming. Finally, as can be noted from confusion at trial, one must wonder which crime Morris was convicted of committing — the crime against L.L., or the subsequent crime against A.T. A.T. testified at this trial and the full proof against Morris regarding A.T. was presented.

Again, I raise my concern that the presumption of innocence is being eroded. I also express deep concern that elementary

---

[1] *See Hamm v. State*, 365 Ark. 647, 232 S.W.3d 463 (2006) (Hannah, C.J., dissenting); *Nelson v. State*, 365 Ark. 314, 229 S.W.3d 35 (2006) (Hannah, C.J., dissenting); *Cluck v. State*, 365 Ark. 166, 226 S.W.3d 780 (2006) (Hannah, C.J., dissenting); *Saul v. State*, 365 Ark. 77, 225 S.W.3d 373 (2006) (Hannah, C.J., concurring); *Swift v. State*, 363 Ark. 496, 215 S.W.3d 619 (2005) (Hannah, C.J., concurring); *Davidson v. State*, 363 Ark. 86, 210 S.W.3d 887 (2005) (Hannah, C.J., concurring); *Davis v. State*, 362 Ark. 34, 207 S.W.3d 474 (2005) (Hannah, C.J., dissenting); *Fells v. State*, 362 Ark. 77, 207 S.W.3d 498 (2005) (Hannah, C.J., dissenting); *McCoy v. State*, 354 Ark. 322, 123 S.W.3d 901 (2003) (Hannah, J., concurring).

evidentiary principles predating[2] the establishment of this state are being ignored in admitting character evidence for the purpose of proving that the defendant acted in conformity therewith on a particular occasion. A conclusory statement that the evidence is being admitted to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident does not make inadmissible character evidence admissible. The error committed by such pro forma analysis is evident in this opinion where the court is holding that while the evidence is not admissible to prove character, it is admissible to show that the criminal defendant had the propensity to commit the acts, which is precisely the same thing and precisely what the rule is intended to prevent. A finding of guilt must rest upon proof, beyond a reasonable doubt, that the accused committed the exact offense for which he is being tried. *Hickey v. State*, 263 Ark. 809, 569 S.W.2d 64 (1978). The right to a fair trial is being compromised.

---

² "The impropriety of giving evidence showing that the accused had been guilty of other crimes, merely for the purpose of thereby inferring his guilt of the crime for which he is on trial, may be said to have been assumed and consistently maintained by the English courts ever since the common law itself has been in existence." *People v. Shea*, 147 N.Y. 78, 99, 41 N.E. 505, 511 (1895).