Demontierre Breon PERRY *v.* STATE of Arkansas

CR 07-107 264 S.W.3d 498

Supreme Court of Arkansas
Opinion delivered October 4, 2007

*William R. Simpson, Jr.*, Public Defender, *Brett Qualls*, Deputy Public Defender, by: *Clint Miller*, for appellant/cross-appellee.

*Dustin McDaniel*, Att'y Gen., by: *Vada Berger*, Ass't Att'y Gen., for appellee/cross-appellant.

ROBERT L. BROWN, Justice. Appellant Demontierre Breon Perry appeals the judgment of conviction for first-degree murder and aggravated robbery and his sentence, as a habitual offender, of sixty years for each offense, to be served consecutively. The State cross-appeals on the issue of whether it was error to give a jury instruction on felony manslaughter as a lesser-included offense of capital-felony murder. We affirm on direct appeal and declare error on cross-appeal.

The facts of this case were developed at trial. London Holman, Perry's uncle by marriage, worked at the Advance Auto Parts ("Advance") on Asher Avenue in Little Rock beginning in July 2004 and ending in January 2005, when he was fired. During the time that Holman was employed by the store, it was customary to have the manager or assistant manager on duty leave work on Sunday night carrying a bank bag containing Friday's, Saturday's, and Sunday's deposits. Sometime after Holman's termination, this custom was changed and all nighttime deposits were eliminated.

On February 19, 2006, Holman left his home in Little Rock a little before 9:00 in the evening. As he drove away, his wife told a friend that he was going to rob Advance. He picked up Perry and Perry's girlfriend, Myesha Cooper, and proceeded to Advance. They dropped Cooper off on a nearby street to watch for employees leaving Advance. When she called and said two men were leaving the building, Perry got out of the car carrying a gun. Holman, who knew what the managerial team looked like, had told Perry to look for a white man wearing a black and white shirt. Holman remained in the vehicle.

Charlie Miles, Jr. and John Shelton were employed by Advance. On the night in question, they closed the store and entered the parking lot at about 9:00 in the evening. Miles got into

his truck and waited to make sure that Shelton's truck, which had not been running properly, would start. While Miles was waiting, Perry approached Miles's truck, opened the front driver's side door, and stuck a gun in Miles's face. Miles told Perry that he could have the truck, but Perry closed the door and walked away, having seen that Miles was a black man in a red and black shirt and therefore did not match the description that Holman had given of the assistant manager.

Perry then approached Shelton, who was white and wearing a black and white shirt. Shelton was still outside his truck, pulling on a pair of coveralls. Perry was heard to shout, "Give me the money, mother fucker." Shortly thereafter, he shot Shelton, striking him in the shoulder. Shelton subsequently died from the gunshot wound. Perry suggested in his statement to police and through his counsel at trial that the gun discharged accidentally while he and Shelton struggled for the gun. The medical examiner could not rule out this possibility, although he did testify that there was no evidence that Shelton was touching the gun when it discharged. Expert testimony was introduced that the gun was not touching Shelton but was no more than ten inches away from him when it was fired.

While these events were occurring, Miles fled the parking lot in his truck. Perry shot the gun a second time, hitting Miles's truck. Miles left the parking lot but returned shortly thereafter and found Shelton lying on the ground.

The police investigation soon led to Holman, and a search of both Holman's and Perry's residences ensued. The police recovered a box of ammunition from Holman's home, and in Perry's home, police officers found a pistol, loaded with six live rounds, and additional bullets. A forensic firearm and tool mark examiner found that the bullets recovered from Perry's home, the bullets recovered from Holman's home, and the bullets recovered from the crime scene were of the same type, were all purchased at Wal-Mart, and could have come from the same box. He also testified that the bullets recovered from the crime scene were fired from the gun recovered from Perry's house. Perry was charged with capital-felony murder and aggravated robbery. At the jury trial that followed, Perry did not call any witnesses during the guilt phase of the trial.

Before the jury instructions on the law were read to the jury, the State objected to the inclusion of felony manslaughter as a lesser-included offense of capital-felony murder. The circuit court

overruled this objection. The jury convicted Perry of first-degree-felony murder and aggravated robbery.

This was followed by a sentencing hearing. Perry's mother, Edna Peel, testified at that hearing that she had heard Holman had blackmailed Perry and forced him to participate in the robbery and that Perry had told her he was sorry for what he did. She also testified that Perry suffered from attention deficit hyperactivity disorder, anxiety, depression and insomnia.

Defense counsel next attempted to have Peel read a letter that she had helped Perry write to Shelton's family. The prosecutor objected, saying that the letter was hearsay and that if Perry wanted the letter introduced, he should take the stand. The State's objection was sustained, and the letter was not read to the jury. Perry did not testify at the sentencing hearing.

The jury was informed that Perry had previously been convicted of three felonies, which qualified him for an increased sentence as a habitual offender under Ark. Code Ann. § 5-4-501 (Repl. 2006). These habitual-offender guidelines provided for a sentence of ten to sixty years or life for each Class Y felony. The jury sentenced Perry to sixty years for each conviction, as previously referenced in this opinion.

After the jury was dismissed, Perry's counsel read the court the letter he had written to Shelton's family. The letter expressed remorse, stated that the shooting was an accident, and mentioned that Perry had been coerced into participating by Holman.

Perry contends on direct appeal that the letter which his mother sought to read for him at the sentencing hearing contained mitigating circumstances that were relevant. Those mitigating circumstances are: (1) that Perry did not intend to kill Shelton; (2) that he was coerced into committing the robbery by Holman; and (3) that he was remorseful. Perry claims that the letter would have provided reasons to impose a less severe sentence. Perry urges that, as a result of the judge's ruling, he was prejudiced by the imposition of a sentence in excess of the minimum sentence allowable.

The State, on the other hand, first maintains that Perry's argument regarding the relevance of the letter was not preserved because he did not mention relevance or mitigating circumstances at the hearing. Furthermore, the State argues that, even if the letter was relevant, it was inadmissible hearsay. Lastly, the State argues that Perry has failed to show that he was prejudiced by the letter's

exclusion. In support of this argument the State notes: (1) that other evidence of lack of intent, coercion and remorse was introduced either at trial or during sentencing; and (2) that under the recent rulings of this court, it has been established that no prejudice can be shown where the sentence received is less than the statutory maximum.

▮ Though the State correctly points out that the words "relevance" or "mitigating circumstance" were not used at the sentencing hearing by Perry, our preference is to decide this issue on the merits. The prosecutor objected to Peel reading Perry's letter as hearsay and contended that the proper way to present it to the jury was for Perry to take the stand and read his own letter. This he refused to do but sought, rather, to have his mother read his words for him. This is classic hearsay and falls well within the definition set in our rules: " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ark. R. Evid. 801(c) (2007). That is precisely what Edna Peel was attempting to do with the letter on her son's behalf. We affirm on this point.

The next issue for our consideration is the State's cross-appeal on the instruction for felony manslaughter. Perry answers that this question is moot, given that Perry was not convicted of felony manslaughter. The Arkansas Rules of Appellate Procedure — Criminal allow the State to appeal where the attorney general finds "that error has been committed to the prejudice of the state, and that the correct and uniform administration of the criminal laws requires review by the Supreme Court." Ark. R. App. P. – Crim. 3(c) (2007).

The initial question regarding mootness is whether Rule 3(c) requires the State to demonstrate that the error complained of resulted in prejudice in the case at hand, or merely that the error, if repeated, could result in prejudice in future cases. Because Perry was convicted of first-degree murder, the State does not and cannot argue that it was prejudiced by the inclusion of felony manslaughter as a lesser-included offense in this particular case. Instead, the State argues that, despite the language of Rule 3(c), no such showing of prejudice is required.

We agree with the State. In *Boone v. State*, this court declared error in the trial court's exclusion of a dying declaration, despite the fact that the defendant had been convicted of the crime with

which she was charged. 282 Ark. 274, 275, 280, 668 S.W.2d 17, 18, 21 (1984). Likewise, in *State v. Brown*, this court, ruling on the State's cross-appeal, noted that the trial court's choice of jury instructions was in error. 265 Ark. 41, 44, 577 S.W.2d 581, 583 (1979). The court did so even though the defendant was convicted under the jury instruction used and even despite the fact that the defendant's appeal was granted, and his conviction reversed and dismissed. *Id.* The court concluded as it did because "there could be other[] [prosecutions] for this same offense." *Id.* Both *Boone* and *Brown* indicate this court's willingness to accept the possibility of future prejudice to the State as grounds for hearing an appeal by the State.

In short, the question of whether felony manslaughter is a lesser-included offense to felony murder has ramifications for all prosecutions for felony murder, making it "important to the correct and uniform administration of criminal law." Ark. R. App. P. – Crim. 3(c) (2007). Likewise, the issue presented is narrow in scope. *State v. Hagan-Sherwin*, 356 Ark. 597, 602, 158 S.W.3d 156, 159-60 (2004). Lastly, the issue presented by the State is purely one of statutory interpretation and is not dependent upon the facts of the case. *State v. Williams*, 348 Ark. 585, 588, 75 S.W.3d 684, 687 (2002) We, therefore, address the merits of the State's appeal.

Both capital and first-degree-felony murder require that "[i]n the course of and in furtherance of [a qualifying felony] or in the immediate flight from the felony, the person or an accomplice causes the death of any person under circumstances manifesting extreme indifference to the value of human life." Ark. Code Ann. §§ 5-10-101(a)(1)(B), 102(a)(1)(B) (Repl. 2006).[1] Felony manslaughter, on the other hand, occurs when a person "commits or attempts to commit a felony . . . and [i]n the course of and in furtherance of the felony or in immediate flight from the felony . . . [t]he person or an accomplice negligently causes the death of any person." Ark. Code Ann. § 5-10-104 (Repl. 2006). The difference between felony murder and felony manslaughter, there-

---

[1] The difference between the two stems from the fact that only the commission of certain enumerated felonies qualifies a person for capital-felony murder, while first-degree-felony murder can be the result of the commission of any felony. Ark. Code Ann. §§ 5-10-101(a)(1)(A), 102(a)(1)(A) (Repl. 2006)

fore, centers on whether the death is caused "under circumstances manifesting extreme indifference to the value of human life" or instead is caused "negligently."

 As this court stated in *McCoy v. State*, there are three independent ways in which an offense can qualify as a lesser-included offense under Arkansas statute. 347 Ark. 913, 919, 921, 69 S.W.3d 430, 433, 435 (2002) (interpreting Ark. Code Ann. § 5-1-110(b), and retreating from earlier cases which had held that three separate requirements must *each* be met). Under § 5-1-110(b), an offense is a lesser-included offense if it: (1) "[i]s established by proof of the same or less than all of the elements required to establish the commission of the offense charged," (2) "[c]onsists of an attempt to commit the offense charged or to commit an offense otherwise included within the offense charged," or (3) "[d]iffers from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a lesser kind of culpable mental state suffices to establish the offense's commission."

Felony manslaughter does not qualify as a lesser-included offense to felony murder under the first test of § 5-1-110(b), given that felony manslaughter requires that the State prove negligence, which is not an element of felony murder. Nor does felony manslaughter qualify under the second test, because it is not an attempted felony murder. Likewise, felony manslaughter does not present a less serious injury or risk of injury than felony murder. Therefore, the only question is whether felony manslaughter only differs from felony murder in that "a lesser kind of culpable mental state suffices to establish the offense's commission." *Id.*

This court has a line of cases in which it has said that in felony murder "the culpable intent or *mens rea* relates to the crime of the underlying felony . . . and not to the murder itself." *Jenkins v. State*, 350 Ark. 219, 225, 85 S.W.3d 878, 881 (2002); *Cook v. State*, 345 Ark. 264, 269, 45 S.W.3d 820, 823 (2001); *Jones v. State*, 336 Ark. 191, 204, 984 S.W.2d 432, 438 (1999) ("[I]n felony murder, a defendant need only have the requisite intent to commit the underlying felony, not the murder."). In one such case, this court had the opportunity to address whether felony manslaughter qualified as a lesser-included offense of felony murder, and this court held that it did not. *Hill v. State*, 344 Ark. 216, 224-25, 40 S.W.3d 751, 755 (2001), *overruled on other grounds by Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003). In so doing, this court

noted that the culpable mental state for felony murder and felony manslaughter were the same, because each related to the mental state of the underlying felony. *Id.*

This court has observed recently that "[t]he requirement of extreme indifference involves actions that evidence a mental state on the part of the accused to engage in some life-threatening activity against the victim." *Williams v. State,* 351 Ark. 215, 224, 91 S.W.3d 54, 59 (2002). *See Jordan v. State,* 356 Ark. 248, 255, 147 S.W.3d 691, 694-95 (2004). Clearly, our reference to "against the victim" was not made with respect to a specific victim deliberately or purposefully killed, but generally referred to the person who died as a result of the defendant's perpetration of the felony.

▮ We conclude that the language "under circumstances manifesting extreme indifference to the value of human life" does not add an additional *mens rea* element to felony murder. We emphasize that the sole *mens rea* element in capital-felony murder and first-degree-felony murder relates to the underlying felony (here, aggravated robbery) and not to the homicide itself. The "extreme indifference" element is not a culpable mental state relating to a specific homicide victim but merely describes the dangerous circumstances generally set in motion by the defendant. Because the "extreme indifference" standard is not a *mens rea* related to a specific victim, we hold that it cannot support a lesser-included offense based on a less culpable mental state. We further hold, as we did in *Hill v. State, supra,* that a negligent homicide under felony manslaughter is not a lesser-included offense of capital-felony murder or first-degree-felony murder. Accordingly, the circuit court erred in instructing the jury on felony manslaughter as a lesser-included offense in this case.

Affirm on direct appeal. Error declared on cross-appeal.