London HOLMAN *v.* STATE of Arkansas

CR 07-317                                                    269 S.W.3d 815

Supreme Court of Arkansas
Opinion delivered December 13, 2007

*Arkansas Public Defender Commission*, by: *Teri Chambers*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Vada Berger*, Ass't Att'y Gen., for appellee.

JIM HANNAH, Chief Justice. Appellant London Holman appeals the judgment and commitment order of the Pulaski County Circuit Court convicting him of capital murder and aggravated robbery, for which he was sentenced to concurrent terms of life imprisonment and forty years, respectively. On appeal, Holman raises six points for reversal and contends that the circuit court erred: (1) in allowing the State to present bad-act evidence; (2) in refusing to allow Holman to present the testimony of firearms expert, Richard Ernest; (3) in refusing to grant an in-camera hearing to determine if the State

would ask irrelevant questions that would force Holman to invoke his Fifth Amendment privilege against self-incrimination and in refusing to grant a mistrial when Holman was forced to invoke the privilege in the presence of the jury; (4) in refusing to grant a hearing on Holman's motion for new trial; (5) in refusing to instruct the jury that it was not to draw any inference from Holman's claim of his privilege against self-incrimination and in denying his motion for new trial; and (6) in showing partiality to the State over the defense, thereby violating the due process clauses by denying Holman a fair trial. The State raises one point for reversal on cross-appeal, arguing that the circuit court erred in instructing the jury that felony manslaughter is a lesser-included offense of felony murder. As this is a criminal appeal involving a sentence of life imprisonment, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(a)(2). We reverse and remand on direct appeal and declare error on cross-appeal. We need address only two points on appeal and the point on cross-appeal.

Because Holman does not challenge the sufficiency of the evidence, only a brief recitation of the facts adduced at trial is necessary. On the night of February 16, 2006, Holman's wife told her godmother, Latona McDonnell, that Holman and others were going to rob Advance Auto Parts, where he once worked. Later that night, Holman drove Demontierre Perry and Myesha Cooper to a location near the store. Perry approached John Shelton, a manager at Advance Auto Parts, demanded money from him, and then shot him, killing him. Holman, Perry,[1] and Cooper were subsequently charged with capital murder and aggravated robbery. Holman admitted that he participated in planning the robbery, that he drove Perry and Cooper to the approximate scene of the robbery, and that he advised Perry to dispose of the gun after Perry told him he shot someone, but he asserted an affirmative defense, pursuant to Ark. Code Ann. § 5-10-101(b) (Supp. 2003), averring that he was not the only participant in the offense and that he did not commit the homicidal act or in any way solicit, command, induce, procure, counsel, or aid in its commission.

### Admission of Bad-Act Evidence

Holman first argues that the circuit court abused its discretion in admitting evidence of a statement he made on the tele-

---

[1] This court affirmed Demontierre Perry's convictions for first-degree murder and aggravated robbery. *Perry v. State*, 371 Ark. 170, 264 S.W.3d 498 (2007).

phone to then thirteen-year-old Iesha McDonnell and by admitting checks, driver's licenses, and Social Security cards belonging to third parties discovered during a search of his home. Holman contends that this evidence was admitted, in violation of Arkansas Rule of Evidence 404(b), to prove that he was a bad person, and that, even if the evidence were somehow relevant, it nevertheless should have been excluded under Arkansas Rule of Evidence 403 because its probative value was substantially outweighed by the danger of unfair prejudice.

Arkansas Rule of Evidence 404(b) allows evidence of other crimes, wrongs, or acts to be admitted if it is relevant to show such things as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." However, evidence is not admissible under Rule 404(b) if its purpose is to show a defendant's bad character traits and to show he acted in conformity therewith in the case at bar. *See Morris v. State*, 367 Ark. 406, 240 S.W.3d 593 (2006). For evidence to be admissible under Rule 404(b), it must be relevant to prove the main issue independently from proving bad character. *See Green v. State*, 365 Ark. 478, 231 S.W.3d 638 (2006).

Evidence admitted under 404(b) is independently relevant if it has a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *Morris, supra.* When evidence of a prior wrong reflects consciousness of guilt of the commission of the crime charged, it is independently relevant and admissible under Rule 404(b). *See Eliott v. State*, 342 Ark. 237, 27 S.W.3d 432 (2000).

*Statement to Iesha McDonnell*

Iesha McDonnell is the daughter of the godmother of Holman's wife. On March 23, 2006, Holman called the McDonnell home in order to speak with his wife, who was then living with the McDonnells. When his attempts to speak with his wife and Iesha's mother, Latona, were unsuccessful, Holman stated, "All you bitches and some hos, man. I got all you motherfuckers when I get up out of here. Fuck this shit." Before admission of this statement, the jury learned that Iesha's mother informed the police of Holman's participation in the robbery and subsequently wore a wire in order to help identify other people involved. The information she provided led to the issuance of a warrant to search

Holman's house. On February 24, 2006, Detective Eric Knowles of the Little Rock Police Department told Holman that he had been speaking with Holman's wife and that he knew what happened. Knowles testified that he thought his interview with Holman's wife prompted Holman to give a statement — a thought Holman confirmed in his statement to the police and in his testimony at trial.

As he did before the circuit court, Holman argues that the recorded statement is inadmissible because it is improper character evidence and it does not demonstrate his "consciousness of guilt." Both Holman and the State cite to *Mendiola v. State*, 92 Ark. App. 359, 214 S.W.3d 271 (2005), where the court of appeals held that evidence of a defendant's nonverbal threats to a police officer during a pretrial hearing was admissible under Rule 404(b) to show the defendant's consciousness of guilt. The State contends that *Mendiola* supports admission of the statement, while Holman claims that *Mendiola* is clearly distinguishable. In *Mendiola*, at a pretrial hearing, the appellant looked toward a police investigator, made a "finger-gun motion," and put his thumb down in a shooting motion. During the same hearing, the appellant mouthed the words "you're dead" to the police investigator.

The court of appeals noted:

> The State argues that the testimony regarding appellant's nonverbal threats was relevant and probative to prove his consciousness of guilt with respect to the charges of aggravated robbery and kidnapping. They were not offered simply to show that he was a criminal, but rather to show his attempt to silence a key witness from testifying at trial. Efforts to conceal evidence demonstrate a consciousness of guilt and are therefore admissible. *Coggin v. State*, 356 Ark. 424, 156 S.W.3d 712 (2004); *see also Eliott v. State*, 342 Ark. 237, 27 S.W.3d 432 (2000) (holding that when evidence of a past crime reflects a consciousness of guilt, it is independently relevant and admissible under Rule 404(b)). The Eighth Circuit Court of Appeals has specifically held that evidence of death threats against witnesses or other parties cooperating with the government is generally admissible against a defendant to show consciousness of guilt with respect to the crimes charged. *United States v. Griffith*, 301 F.3d 880 (8th Cir. 2002).

*Mendiola*, 92 Ark. App. at 362, 214 S.W.3d at 274.

Holman claims that *Mendiola* is not on point because the evidence in the case at bar does not show an attempt to silence a witness from testifying at trial; thus, it does not constitute evidence of consciousness of guilt with respect to the crimes charged. For its part, the State claims that, when Holman spoke to Iesha on March 23, 2006, he may well have known that her mother gave information to the police about the robbery and he certainly knew that his wife had. While it is not clear from the record whether Holman knew that Latona had been cooperating with the police, it is certainly evident that Holman knew police had spoken to his wife. As previously mentioned, on February 24, 2006, Detective Knowles told Holman that he had been speaking with Holman's wife and that he knew what happened, and Holman admitted that the communication with his wife prompted him to give a statement to police. The State contends that Holman was aware that his wife was cooperating with the police in the investigation of his crimes, and that, against that backdrop, his claim that those staying in the McDonnell household were "bitches" and "hos" and that, when "he g[o]t up out of here[,]" he was going to "g[e]t all you motherfuckers[ ]" could reasonably be understood as a threat against the women who had cooperated with the police.

Holman claims that his conversation with Iesha did not demonstrate his consciousness of guilt, but that it merely showed his frustration at not being able to speak to his wife about arranging bail. As pointed out by the State, the jury was aware that Holman was frustrated about not being able to speak with his wife. Iesha testified that Holman called and wanted to speak to his wife, but that his wife did not want to speak to him. She also stated that she could tell Holman was frustrated by the tone of his voice. Thus, the State contends that the jury could decide for itself whether Holman's threat stemmed from his frustration about not being able to speak to his wife or from a combined frustration that the women of the McDonnell household were conspiring against him, a conspiracy that included refusing to speak with him as well as cooperating with the police. As previously noted, it is not clear from the record that Holman knew that Latona had been cooperating with the police, but it is quite clear from the record that he knew that his wife had been speaking to the police. What prompted Holman's statement to Iesha, be it his frustration over not being able to speak to his wife or his frustration over his wife's conversation with police, was a matter for the jury to decide.

Accordingly, we hold that the circuit court did not abuse its discretion in admitting evidence of the recorded conversation.[2]

■       Still, Holman argues that, even if this court determines that the statement was independently relevant, the circuit court should have excluded it pursuant to Arkansas Rule of Evidence 403 because the statement had no probative value and was highly prejudicial. The balancing of probative value against prejudice, under Rule 403, is a matter left to the sound discretion of the circuit court. *Davis v. State*, 368 Ark. 401, 246 S.W.3d 862 (2007). The lower court's decision on such a matter will not be reversed absent a manifest abuse of that discretion. *Id.* We cannot say that the circuit court abused its discretion in concluding that the statement was admissible pursuant to Rule 403.

■       Finally, Holman argues that the admission of his conversation with Iesha was unduly prejudicial because it revealed that he was incarcerated at the time. The State claims that Holman did not raise this argument below. The State is incorrect. The record clearly reflects that Holman raised this argument at the trial level. Nevertheless, Holman's argument is without merit. We have stated that facts which indicate that a defendant is incarcerated are not prejudicial per se. *Banks v. State*, 315 Ark. 666, 869 S.W.2d 700 (1994). We have further stated that prejudice will not be presumed. *Id.* The fact that Holman was in jail at the time he spoke to Iesha is not prejudicial in and of itself. The jurors knew, per testimony at trial, that Holman had been arrested on February 24, 2006, for the crimes for which he was on trial; thus, the jury would likely not be surprised by the fact that Holman was still in jail on March 23, 2006, the day he made the statement to Iesha. *See Banks*, 315 Ark. at 672, 869 S.W.2d at 704 (stating that "[i]t would come as no surprise to the jury to learn that a person charged with capital murder was a resident of the county jail before trial"). For the

---

[2] We note that Holman claims that the jury heard only a snippet of the conversation rather than the entire conversation, which allegedly would have shown that his remarks reflected only his anger about not being able to speak with his wife. The record reflects that the circuit court did not prevent Holman from playing a recording of the entire conversation. Before trial, the deputy prosecutor stated that if the defense wanted him to, he would play the entire conversation, and the circuit court did not rule that it could not be played. When the deputy prosecutor played the portion of the conversation, Holman did not request that it be played in full.

foregoing reasons, we hold that the circuit court did not abuse its discretion in admitting the statement Holman made to Iesha.

### Checks, Driver's Licenses, and Social Security Cards

During its case-in-chief, the prosecution presented evidence that, during a search of Holman's home, a black plastic bag was found in the crawl space underneath the bathroom, which was accessed by a hole in the bathroom floor.[3] Inside the bag was a "Styrofoam holder" containing thirty-one rounds of .38 Special ammunition. Testimony was offered showing that a revolver seized at Perry's residence contained six live Winchester .38 caliber rounds. Further testimony showed that four additional Winchester .38 rounds were discovered on Perry's dresser. The prosecution also offered evidence to prove that the cartridges discovered in the revolver and on the dresser at Perry's residence could have come from the box of cartridges originally contained in the "Styrofoam holder" discovered at Holman's residence. Testimony showed that the bunter marks on the rounds found at Holman's residence were similar to the bunter marks on the rounds found in the revolver and the rounds found on the dresser.

In rebuttal, the prosecution sought to introduce evidence of checks, driver's licenses, and Social Security cards belonging to others which were found in Holman's home. Holman argued below, as he does on appeal, that the evidence was inadmissible under Rule 404(b) because it related to uncharged conduct and had no independent relevance to the charges against him. Holman states that the evidence was highly prejudicial in that it likely persuaded the jury that he was a criminal who must have also committed the crimes at issue in the case at bar.

The State contends:

> The prosecution's theory was that appellant provided Perry the bullets used in the crimes and knew that discovery of the bullets in his house could link him to the crimes. Consequently, when he learned that the police were getting ready to enter his house, he hid the box of bullets, implicating him in a murder, instead of hiding the

---

[3] According to Todd Hurd, a detective with the Little Rock Police Department, police searched in the bathroom crawl space because after they announced their presence before executing the warrant, they heard a noise, like something being banged against ceramic, coming from the direction of the bathroom.

checks, driver's licenses, and Social Security cards implicating him in significantly less serious crimes. Had appellant not known the bullets connected him to the crimes, he would not have hidden them, but, instead, would have hidden evidence of his other crimes. Because this evidence tended to show appellant's knowledge and rebut his claim that he was not aware Perry had a gun — a claim crucial to his affirmative defense to first-degree murder pursuant to Ark. Code Ann. § 5-10-102(b)(3) (Repl. 2006) — the trial court did not abuse its discretion by admitting it over his objections.

We are unimpressed with the State's argument. Apparently, the State asks us to infer from the facts that when Holman realized that the police were about to enter his home, he decided that he only had time to hide either the evidence of his complicity in the murder of John Shelton or the evidence of his lesser and wholly unrelated crime of identification theft. Based on this inference, we are asked to make yet another inference, which is that Holman naturally chose to hide the evidence of the more serious crime. From these two inferences, we are asked to reach a third inference — that leaving the evidence of the crime of identification theft where it could be found shows that Holman was involved in the murder and knew Perry had a gun. This sort of deduction is not even permissible in a civil case. In *State Farm Mutual Automobile Insurance Co. v. Traylor*, 263 Ark. 92, 565 S.W.2d 595 (1978), we stated that an inference is not a substitute for evidence. Further, the indulgence of inferences will not supply a non-existent fact. *Id.* An inference may not be forced and guess-work is not an allowable substitute for evidence. *Id.* Even if we were to indulge the State's stacking of inferences, the evidence would still be inadmissible because its probative value is less than slight and the prejudicial harm is great. The circuit court clearly abused its discretion in admitting this evidence.

### Denial of Motions for Mistrial

We next turn to Holman's argument that the circuit court erred in denying his motions for mistrial after he was forced to invoke his privilege against self-incrimination in front of the jury. Early in the trial, Holman notified the court and the prosecutor that, because the prosecutor had informed his counsel that he may be charged with a federal crime if he were not convicted of the charges in state court, he would invoke the privilege against self-incrimination to questions which may be posed by the pros-

ecutor about domestic abuse or ownership of a gun. The prosecutor responded that Holman's taking the stand would result in a waiver of his Fifth Amendment privilege, making all questioning "fair game." Holman replied that a criminal defendant cannot be forced to choose between testifying and not incriminating himself with regard to potential charges that the government may bring. In addition, Holman gave notice that if he were forced to invoke the privilege in the jury's presence, he would request a mistrial.

Holman argued that, on cross-examination, the prosecutor could question him regarding those areas that could result in future charges only if Holman opened the door to those areas on direct examination. The circuit court disagreed, stating: "If he takes the stand, he's opening himself up to anything that's asked." In addition, the circuit court rejected Holman's request for an in-camera review of Holman's testimony prior to his taking the stand. Holman took the stand and invoked the privilege several times, prompting defense counsel to make motions for mistrial. Each motion was denied.

■ First, we must address the circuit court's ruling that, once Holman took the stand, the State was free to question him on any matter. The circuit court erred. The Supreme Court of the United States has explained:

> It is well established that a witness, in a single proceeding, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details. *See Rogers v. United States*, 340 U.S. 367, 373 (1951). The privilege is waived for the matters to which the witness testifies, and the scope of the "waiver is determined by the scope of relevant cross-examination," *Brown v. United States*, 356 U.S. 148, 154–55 (1958). "The witness himself, certainly if he is a party, determines the area of disclosure and therefore of inquiry," *id.*, at 155.

. . . .

> The justifications for the rule of waiver in the testimonial context are evident: A witness may not pick and choose what aspects of a particular subject to discuss without casting doubt on the trustworthiness of the statements and diminishing the integrity of the factual inquiry. As noted in *Rogers*, a contrary rule "would open the way to distortion of facts by permitting a witness to select any stopping place in the testimony," 340 U.S. at 371. It would, as we said in

> *Brown*, "make of the Fifth Amendment not only a humane safe-guard against judicially coerced self-disclosure but a positive invitation to mutilate the truth a party offers to tell," 356 U.S. at 156. The illogic of allowing a witness to offer only self-selected testimony should be obvious even to the witness, so there is no unfairness in allowing cross-examination when testimony is given without invoking the privilege.

*Mitchell v. United States*, 526 U.S. 314, 321–22 (1999). *See also Hill v. State*, 285 Ark. 77, 685 S.W.2d 495 (1985) (stating that, where the defendant took the stand and raised the subject on direct, the State's cross-examination of the defendant on that subject was proper).

The circuit court clearly erred in concluding that, if Holman testified, he waived the privilege as to *any questioning* by the State. Holman waived his privilege only to those matters to which he testified. But our inquiry does not end here. We must determine whether the questions to which Holman asserted the privilege were within the scope of relevant cross-examination. We look to Holman's testimony and claims of privilege to determine whether Holman was, in fact, entitled to assert the privilege and, if so, whether his assertion of the privilege in front of the jury warranted a mistrial.

On direct examination, Holman testified that he realized Perry had a gun when Perry got back into his truck after the robbery, that he did not hear a loud crashing noise that Detective Hurd had reported hearing when officers arrived at his house, and that the bathroom under which the officers found cartridges was not usable, as it was being remodeled and there was a hole in the floor. On cross-examination, the following occurred:

Q: I'd like to ask you some questions about the gun. Are you saying that you've never seen that gun before?

A: I'd like to plead the Fifth on that.

Q: Well, I'm asking you. . .

At that point, defense counsel approached the bench and moved for a mistrial. The circuit court denied the motion. Further, the circuit court stated that he would instruct Holman to answer the question and informed Holman that if he did not answer, the court would hold him in contempt. Cross-examination then resumed:

Q: Mr. Holman, have you ever seen that gun before?

A: I'd like to plead the Fifth.

THE COURT: I'm instructing you to answer that question, Mr. Holman.

HOLMAN: I'd like to plead the Fifth, Your Honor.

Q: So you're telling us that you're going to refuse to answer that question?

A: I would like to plead the Fifth Amendment on that question.

Q: Okay, well, now, I didn't ask you if you were pleading the Fifth; I asked specifically if you were refusing to answer that question. That's a pretty simple question, yes or no?

A: I have a constitutional right, sir.

Q: Okay. Well, how about this? You were asked earlier what kind of things you and Mr. Perry do together; is that correct?

A: Yes.

Q: And you said you liked to go and play pool or whatever; is that correct?

A: Yes, it is.

Q: You ever went to go shoot this gun with Mr. Perry on New Year's Eve?

A: I would like —

Q: This last year?

A: I would like to plead the Fifth Amendment.

Q: You're refusing to answer that question?

A: I would like to plead the Fifth Amendment.

DEFENSE COUNSEL: Your Honor, we would again renew our motion.

THE COURT: It's overruled.

Q: Would you agree that you kept — before Mr. Shelton was killed, you kept that gun at your house under your mattress?

A: I would like to plead the Fifth Amendment, Your Honor.

Q: So are you refusing to answer that question?

DEFENSE COUNSEL: Same objection, Your Honor.

THE COURT: Overruled. Answer the question.

A: I would like to plead the Fifth Amendment, Your Honor.

Q: As it relates to, I guess, would you — you were saying earlier that you had a hole in your house, in the floor of your house, correct?

A: Yes, I do.

Q: And there was water damage in that hole?

A: Yes.

Q: Is that a reasonable place to keep ammunition?

A: No, it's not.

Q: It's not? Why'd you put ammunition under the house?

A: I would like to plead the Fifth Amendment on that, also.

The State contends that the deputy prosecutor's questions regarding the gun and ammunition were permissible because Holman's knowledge of the gun before the robbery and his use of a hole in the floor of an unusable bathroom for the storage of bullets were reasonably related to his testimony on direct examination. We agree. The questions regarding the gun and ammunition were within the scope of relevant cross-examination. The United States Supreme Court has stated:

> If he takes the stand and testifies in his own defense his credibility may be impeached and his testimony assailed like that of any other witness, and the breadth of his waiver is determined by the scope of relevant cross-examination. '[H]e has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts.' *Fitzpatrick v. United States*, 178 U.S. 304, 315; and see *Reagan v. United States*, 157 U.S. 301, 304-05.

*Brown v. United States*, 356 U.S. 148, 154-55 (1958).

■ Because the deputy prosecutor's questions regarding the gun and ammunition were within the relevant scope of cross-examination, Holman was not entitled to assert his privilege against self-incrimination as to those questions. The circuit court did not err in denying Holman's motion for mistrial as to this questioning.

Holman next asserted the privilege when asked about the checks, driver's licenses, and Social Security cards belonging to other individuals that were found during the search of his home. The deputy prosecutor contended that questions regarding these items were within the relevant scope of cross-examination because Holman had testified that he was having financial difficulties.[4] The following occurred:

Q: When the police did their search warrant on your desk here, why would you have Micah Davidson's driver's license?

A: I would like to plead the Fifth, sir.

Q: Why would you have Joshua Norton's Social Security card and driver's license?

A: I also plead the Fifth on that, too.

Q: Why would you have Christopher Carrots' Social Security card and driver's license?

DEFENSE COUNSEL: We renew our motion for a mistrial, Your Honor.

THE COURT: That's denied.

A: I also plead the Fifth on that.

Q: Why would you have Marcello Covington's blank check?

A: I'd also like to plead the Fifth on that.

---

[4] Although we have determined that the circuit court abused its discretion in admitting the evidence on rebuttal pursuant to Ark. R. Evid. 404(b), the evidence could potentially be admissible on cross-examination if, as the State alleges, Holman opened the door to questions about the checks, driver's licenses, and Social Security cards during direct examination.

Q: Sarah Weedman's blank check?

A: I'd also like to plead the Fifth on that.

Q: A check made out for $603.12 to Engeli Clark.

A: I'd also like to plead the Fifth on that.

Q: This is at your house, is it not?

A: I would like to plead the Fifth.

■ Upon review of the record, we conclude that the questions regarding the checks, driver's licenses, and Social Security cards found at Holman's house were not within the relevant scope of cross-examination. Holman testified that he was having financial difficulties. He did not testify that he was engaged in identification theft to resolve his financial problems. Because his answers to those questions could incriminate him in a matter wholly unrelated to the case at bar and because Holman did not open the door to such questions when he testified on direct examination that he was having financial difficulties, Holman should not have been forced to invoke his privilege against self-incrimination in front of the jury. Holman argues that he was entitled to a mistrial, and we agree. We have made it very clear that a mistrial is a drastic remedy that should only be granted when justice cannot be served by continuing at trial, or when the error cannot be cured by an instruction or admonishment. *See, e.g., Jackson v. State*, 368 Ark. 610, 249 S.W.3d 127 (2007). Whether the error could have been cured by an instruction or admonishment is not at issue here because the circuit court refused a requested instruction regarding privilege. Here, once Holman was forced to assert his privilege against self-incrimination in front of the jury, with respect to the questions concerning the checks, driver's licenses, and Social Security cards found at his home, justice could not be served by continuing the trial. At that point, the granting of a mistrial was warranted, and the circuit court erred in denying Holman's mistrial motion.

On direct appeal, we have addressed the points that require reversal, as well as the points that are likely to come up again upon retrial. We hold that the circuit court did not abuse its discretion in admitting evidence of a statement he made on the telephone to Iesha McDonnell. We hold that the circuit court abused its discretion in admitting evidence of checks, driver's licenses, and

Social Security cards belonging to third parties. We hold that the circuit court did not err in denying Holman's motion for mistrial when Holman asserted his privilege against self-incrimination in front of the jury with respect to questions concerning the gun and ammunition. We hold that the circuit court erred in denying Holman's motion for mistrial when Holman asserted his privilege against self-incrimination in front of the jury with respect to questions concerning the checks, driver's licenses, and Social Security cards belonging to third parties. We need not address the remaining points on appeal.

We will, however, address the State's argument on cross-appeal. The State contends that the circuit court erred in instructing the jury that felony manslaughter is a lesser-included offense of felony murder. We agree. Recently, in *Perry v. State*, 371 Ark. 170, 264 S.W.3d 498 (2007), we reaffirmed our holding in *Hill v. State*, 344 Ark. 216, 40 S.W.3d 751 (2001),[5] that a negligent homicide under felony manslaughter is not a lesser-included offense of capital-felony murder or first-degree felony murder. Accordingly, we held in *Perry* that the circuit court erred in instructing the jury on felony manslaughter as a lesser-included offense of felony murder. Likewise, we hold in this case that the circuit court erred in instructing the jury that felony manslaughter is a lesser-included offense of felony murder.

As a final observation, we note that the State, on a variety of points, claimed that Holman's arguments were procedurally barred. While not specifically addressed because of our reversal of this case, our review of the record reveals that several of the issues were indeed clearly preserved. We bring this to the parties' attention merely to point out that appellate parties must take great care in reviewing the record and making arguments to this court.

Reversed and remanded on direct appeal; error declared on cross-appeal.

---

[5] *Hill* was overruled on other grounds by *Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003).