Sharon WHITAKER *v.* STATE of Arkansas

CR 01-1044                                    71 S.W.3d 567

Supreme Court of Arkansas
Opinion delivered April 4, 2002

*Page, Thrailkill, and McDaniel, P.A.*, by: *Patrick McDaniel*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Michael C. Angel*, Ass't Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. The appellant, Sharon Whitaker, appeals from a judgment of conviction for manslaughter and a sentence of ten years. She raises two points on appeal: (1) the trial court erred in permitting the jury to take the videotape of a custodial statement made to the Mena Chief of Police into the jury room as part of its deliberations; and (2) the trial court erred in failing to suppress that statement. We reverse on the second point and remand for further proceedings.

In March 2000, Bill and Sharon Whitaker had been married for about twenty years. They lived in Mena, and they had one child, Matthew, who was nineteen years old at that time. Sharon also had two children from a previous marriage. The couple owned two businesses together, Rich Mountain Aviation and Rich Mountain Aircraft Parts. Bill was the president of both companies, and Sharon served as the companies' office manager.

Their marriage was tumultuous, according to several witnesses who testified at trial, including the Whitakers' son Matthew. Bill had multiple extramarital affairs and was, at times, mentally and physically abusive to his wife and son. Sharon left Bill several times, only to return to him following his promises to recommit himself to the marriage. In January 2000, Sharon learned that her husband had been having another affair, this time with a woman he had known since high school. Sharon decided that she wanted a divorce. The two coexisted uneasily for the next month and a half.

On the afternoon of March 15, 2000, Sharon was at home, packing her husband's clothes into a trailer for purposes of the divorce. Bill was on his way back to Mena from Missouri. He reached the Rich Mountain office at about 3:30 p.m. When he got to his office, his secretary, Carolyn Lindy, updated him on

business matters. He told Lindy that he would be at the office well into the evening.

Sharon had also been in touch with Lindy and wanted Lindy to notify her when her husband returned to the office. According to her trial testimony, Sharon was frightened about their next encounter, because she wanted a divorce and wanted her husband to move out of their home. She told Lindy that she wanted her to call her when Lindy left the office. When Lindy did leave the office around 5:45 p.m., she called Sharon and told her that she was leaving. She also told her that Bill was going to stay at the office to continue working.

Sharon left her home and went to the office. The facts concerning what happened when she got to the office were sharply disputed at trial. Sharon contended that she wanted to speak with her husband about the divorce and his moving out. She testified at her trial that there was a struggle in the Rich Mountain Aviation office and that when Bill pushed her down, she grabbed a pistol on a nearby table and shot him in self-defense. The State countered that Sharon went to the office with the intent to kill her husband and that the shooting was not an act of self-defense.

What is undisputed is that Sharon called 911 at 5:57 p.m. and told the dispatcher that someone had been shot. She requested police and ambulance units. Officer Tim Milham of the Mena Police Department responded to the call. He found Sharon sitting outside the office building, crying. She told Officer Milham that there was someone inside the building who had been shot. Inside the building, he and other responding officers found Bill Whitaker barely alive, with five gunshot wounds to his legs and lower torso. Emergency medical technicians arrived at the scene, and Bill was taken to the hospital where he died from his wounds.

The police officers arrested Sharon and took her to the Mena Police Station. At about 6:30 that evening, she was interrogated by Mena Police Chief Russell Nichols. The interrogation was videotaped. She had already been *Mirandized* once, but Chief Nichols informed her again of her *Miranda* rights and then asked her to tell him what had happened. She initially responded "no," but after Chief Nichols asked again, she began discussing her mar-

riage. She continued to answer questions for fifteen minutes, at which time she asked for an attorney. Chief Nichols stopped the interrogation.

The State charged Sharon with first-degree murder. Subsequently, she moved to suppress her videotaped statement and asserted that Chief Nichols had violated her Fifth Amendment right to remain silent when he continued questioning her after she had first answered "no" to his initial inquiry. The trial court denied her motion to suppress.

A jury trial was held over four days. When they retired, the jurors took Sharon's videotaped statement to Chief Nichols back to the jury room with them. No objection was made to this by defense counsel. In closing argument, the prosecutor had encouraged the jury to watch the videotape during its deliberations. The jury returned a verdict, convicting Sharon of manslaughter, and she was sentenced to ten years' imprisonment.

Sharon asserts that Chief Nichols obtained her videotaped statement in violation of her Fifth Amendment right to remain silent and not incriminate herself. Thus, she argues, it was error for the trial court to admit the videotape into evidence over her motion to suppress. The State argues, in response, that Whitaker did not unequivocally invoke her right to remain silent and that in the absence of an unequivocal invocation, Chief Nichols was well within his authority to continue questioning her.

■ When reviewing a trial court's decision on a motion to suppress, this Court makes an independent determination based on the totality of the circumstances and will reverse if the trial court's decision was clearly against the preponderance of the evidence. *Burris v. State,* 330 Ark. 66, 954 S.W.2d 209 (1997); *Wofford v. State,* 330 Ark. 8, 952 S.W.2d 646 (1997); *Norman v. State,* 326 Ark. 210, 931 S.W.2d 96 (1996); *Bohanan v. State,* 324 Ark. 158, 919 S.W.2d 198 (1996). This court will only reverse a trial court's ruling on a motion to suppress if the ruling was clearly erroneous. *Lacy v. State,* 345 Ark. 63, 44 S.W.3d 296 (2001); *Barcenas v. State,* 343 Ark. 181, 33 S.W.3d 136 (2000).

■ ■  A statement made while an accused is in custody is presumptively involuntary, and the burden is on the State to prove, by a preponderance of the evidence, that a custodial statement was given voluntarily and was knowingly and intelligently made. *Lacy v. State, supra; Smith v. State,* 334 Ark. 190, 974 S.W.2d 427 (1998). A defendant may cut off questioning at any time by unequivocally invoking his right to remain silent. *Michigan v. Mosley,* 423 U.S. 96 (1975). When the right to remain silent is invoked, it must be "scrupulously honored." *Mosley,* 384 U.S. at 479; *Miranda,* 423 U.S. at 103; *Hatley v. State,* 289 Ark. 130, 133, 709 S.W.2d 812, 814 (1986). Our Criminal Rules follow in this mold and provide that a police officer shall not question an arrested person if that person indicates "in any manner" that he does not wish to be questioned. Ark. R. Crim. P. 4.5.

■  A defendant may also waive an invocation of her right to silence. *Bunch v. State,* 346 Ark. 33, 57 S.W.3d 124 (2001). Specifically, answering questions following a statement that attempts to invoke the right to remain silent may waive that right by implication. *Jones v. State,* 344 Ark. 682, 42 S.W.3d 536 (2001); *Bowen v. State,* 322 Ark. 483, 911 S.W.2d 555 (1995); *Standridge v. State,* 329 Ark. 473, 951 S.W.2d 299 (1997). The accused may change her mind and decide to talk to law enforcement officials. *Willett v. State,* 322 Ark. 613, 911 S.W.2d 937 (1995) (citing *Michigan v. Jackson,* 475 U.S. 625 (1986); *Edwards v. Arizona,* 451 U.S. 477 (1981); *Bussard v. State,* 295 Ark. 72, 747 S.W.2d 71 (1988); *Coble v. State,* 274 Ark. 134, 624 S.W.2d 421 (1981)).

Whitaker contends that she unequivocally invoked her right to remain silent at the outset of the videotaped statement. The record contains the following transcription of the interview:

> CHIEF NICHOLS: Now, having these [*Miranda*] rights in mind, like I said, I don't know even what happened. Do you want to tell me what's going on?
>
> SHARON: No.
>
> CHIEF NICHOLS: And, what we're doing?
>
> SHARON: No.

CHIEF NICHOLS: Okay.

SHARON: No. No. No. No.

CHIEF NICHOLS: Well, what's — what happened out there?

SHARON: Huh-uh. [negative response]

CHIEF NICHOLS: Have you been involved in a fight?

SHARON: Well, I can tell you this. My husband decided that he wanted to marry his high school sweetheart and — and I've just found out she's filed for a divorce and they were going to get married. And we've been married for a long time. We have a 19 year old son that just went in the navy and he's doing really good. And we've just started a business and —

CHIEF NICHOLS: Why do people do stuff like that?

However, the tape itself reveals a different sequence of questioning. Whitaker and Nichols were speaking simultaneously at several points. Sharon's six statements of "no" were continuous and were interspersed within Nichols's questions. While Sharon was repeating her statement of "no," she was bent over and shaking her head. The following is a more accurate transcription of the interchange. Sharon's initial "no" is contained within brackets.

CHIEF NICHOLS: Now, having these rights in mind, like I said, I don't know even what happened. Do you want to tell me what's going on [no] and what we're doing?

SHARON: No. No. No. No. No.

CHIEF NICHOLS: Well, what's — what happened out there?

SHARON: Huh uh.

CHIEF NICHOLS: Have you been involved in a fight?

SHARON: Well, I can tell you this. My husband decided that he wanted to marry his high school sweetheart and — and I've just found out she's filed for a divorce and they were going to get married. . . .

At this time, Sharon continued to answer questions and did so for about fifteen minutes. She never directly admitted shooting Bill; however, she said to Chief Nichols: "Put me way away" and

repeatedly said that she did not want to live. She also discussed her marital problems at length. She added: "I'm scared to know what I did." When asked later by the police chief whether she was involved in a shooting, she answered: "Huh, uh, I don't want to talk about it." When she eventually requested an attorney, Chief Nichols ceased the questioning immediately.

The trial court ruled that Sharon never unequivocally invoked her right to remain silent. In doing so he said:

> To me, that [transcription] looked different than what I saw on the tape. Mr. McCombs [defense counsel], I don't see that it's that big a problem, it may very well be, but I'm not as incensed with it as you are. I don't think I need to start setting examples. I don't know what the "no, no, no, no" meant. You interpreted it to mean that no, I don't want to talk to you. I don't know, so, I can't necessarily say that that's what it is. It may very well have been. I don't think the police are required to not say anything at all on a mere suspicion someone might supposedly not want to talk to them. I don't — I'm inclined to deny the motion.

■ When invoking a *Miranda* right, the accused must be unambiguous and unequivocal. *Davis v. United States*, 512 U.S. 452 (1994). For example, when invoking the right to counsel, the Court has said:

> [H]e must articulate his desire to have counsel present suffi- ciently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect.

*Davis*, 512 U.S. at 459. This court has extended the *Davis* hold- ing by reviewing the question of specificity when invoking the right to silence. *Standridge v. State*, supra; *Bowen v. State*, supra. For example, in *Standridge*, we held that a suspect's statement "I ain't ready to talk" was not unequivocal. Likewise, we held in *Bowen* that the statement that the accused wanted to "think about" talking to police officers was not sufficiently definite.

The trial court, in its ruling, considered the series of "no's" to be subject to interpretation. But in reading the colloquy, we note that not only did Sharon respond in the negative at first about

answering questions, but she also answered "Huh-uh" when asked "What happened out there?" When Chief Nichols pursued matters and asked, "Have you been involved in a fight?," she answered, "Well, I can tell you this . . .," as if to say she was willing only to talk about certain facets of what happened. Later on, she repeated that she did not "want to talk about it." Yet, Chief Nichols persisted in his questioning.

As already noted in this opinion, when a suspect invokes her right to silence, that invocation must be scrupulously honored. *Michigan v. Mosley, supra; Miranda v. Arizona, supra; Hatley v. State, supra.* We agree with the State that invoking silence must be unambiguous and unequivocal, but by the same token, the response "no" certainly connotes a desire not to speak. This is especially so when the "no" was followed by "Huh-uh" and then a limited, qualified response. It is true that Sharon was intensely emotional, but the pattern of her answers to the police chief tells this court that she did not want to talk about what happened. Moreover, "no" in common parlance is not an equivocal answer but one of acknowledged clarity and specificity. *See State v. Weeks,* 2000 WL 1473851 (Tenn. Crim. App., Oct. 2, 2001). In short, we hold that Sharon clearly articulated her right to be silent. *See, e.g., Commonwealth v. Sicari,* 434 Mass. 732, 752 N.E.2d 684 (2001).

The State argues that Sharon waived her Fifth Amendment rights by answering questions. But that argument avoids the fact that Chief Nichols never honored her desire not to talk. It is true that waiver has its place after a right to silence has been raised, but the interrogating officer must first cease questioning. *Miranda v. Arizona,* 384 U.S. 436 (1966). Otherwise, the right is meaningless. As the Court has said:

> To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of Miranda by allowing repeated rounds of questioning to undermine the will of the person being questioned.

*Michigan v. Mosley,* 423 U.S. at 102.

Nor can we conclude that admission of Sharon's statement qualifies as harmless error. Her statement was inculpatory,

even though she never confessed to killing Bill. Furthermore, she set out a motive for committing manslaughter and made statements such as "I'm scared to know what I did" and "put me way away." The prejudice from her statement is palpable.

Accordingly, we hold that the trial court clearly erred in refusing to suppress Sharon's statement to Chief Nichols. *Burris v. State, supra.* We reverse the judgment of conviction and remand for further proceedings. Because the videotaped statement has been suppressed, the first issue is moot.

Reversed and remanded.