Lisa Ann GILBERT *v.* STATE of Arkansas

CA CR 03-1303                                              198 S.W.3d 561

Court of Appeals of Arkansas
Opinion delivered November 17, 2004

*Self Law Firm*, by: *Joseph C. Self*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.

ROBERT J. GLADWIN, Judge. Lisa Anne Gilbert was charged with attempted capital murder and filing a false

report. A Yell County jury found her guilty of attempted first-degree murder and filing a false report, and she was sentenced to an aggregate term of thirty years' imprisonment. She raises two points on appeal: (1) the trial court erred in denying her motion to suppress certain statements she made to police; (2) her conviction for attempted first-degree murder should be reversed because she established the defense of renunciation. We affirm.

At the suppression hearing, Lieutenant David Kimball with the Yell County Sheriff's Department testified that he advised appellant of her Miranda rights prior to interviewing her. On the rights form, twenty-year-old appellant indicated that she had graduated from high school and could read and write. Kimball testified that her statement was taped and transcribed. He stated that, during the interview, appellant asked, "Do I need a lawyer or something?" to which he responded, "Are you asking for a lawyer?" Kimball testified that appellant did not answer and that the matter never came up again during the interview.

In denying her motion to suppress, the trial court found that appellant had waived her right to counsel when she signed the Miranda rights form and that her question was not a request for a lawyer and was not a request to stop the interview. The trial court noted that Kimball inquired as to whether she wanted a lawyer and that she did not make the request even though she had ample opportunity to do so.

At trial, Kimball testified that on March 5, 2002, someone called at approximately 9:00 p.m. to report that a child had been abducted. Kimball went to the residence of Brian Blevins to speak to appellant about her missing child, two-year-old S.D.W. Kimball testified that appellant did not appear to be distraught at all. He also testified that appellant's story was different from the time she called the police to when the police arrived to speak with her in person. At first, appellant told Kimball that she stopped her car to pick up the baby's bottle, which had fallen behind the seat, and that people pulled in behind her car and took the baby. Appellant's second version was that some people ran her off the road, stuck a gun in her back, and took the child. Kimball testified that he noticed that appellant did not call S.D.W. by name until approximately twenty minutes after he arrived and that she had been referring to him as simply "the child" or "the kid." Kimball stated that appellant was taken to the police station and was interviewed by him twice. During the first interview, appellant repeated her inconsistent stories. She was interviewed by another officer, who

persuaded her to tell him where the police could find S.D.W. When Kimball subsequently interviewed appellant for the second time, he told her that S.D.W. had been found. Kimball testified that appellant stayed with her initial story that S.D.W. had been abducted but then changed her story again. According to Kimball, appellant said that she took S.D.W. to the overlook on Mount Nebo and that she walked with him to the end of the overlook and then turned around and walked back to the car. Kimball stated that appellant told him that she took S.D.W. to the end of the overlook a second time and threw him over the side and did not look back. Kimball testified that S.D.W. was located thirty-five feet and six inches down from the railing. He also stated that he did some research and determined that the temperature that night was twenty-eight degrees at 2:00 a.m. Kimball testified that appellant's disclosure as to where she thought S.D.W. could be found was instrumental in finding him in such a short time.

Detective Gary Morrison testified that appellant told him two different stories about how her son came to be missing, with a slight variation from what she told Kimball, in that appellant said she stopped to put the baby's shoe back on and not to retrieve his bottle. Morrison noted that appellant appeared calm but confused. He stated that after appellant revealed S.D.W.'s location, he and other officers went to Mount Nebo to search for the boy. Morrison testified that he walked out on the first overlook and that he thought he saw something, so he called the child's name. Morrison heard something, so he went down a steep, rocky hill and through a briar thicket. Morrison testified that when he picked S.D.W. up, the child clung to him.

Sheriff Bill Gilkey testified that he interviewed appellant between the two interviews conducted by Kimball. Gilkey stated that he began talking about S.D.W. and explained how cold it would get later in the night and how it was imperative that they find him soon. Gilkey stated that he asked her where they might find S.D.W. and that, although she at first said she did not know, appellant finally said that the abductors might have taken him to Mount Nebo. Gilkey stated that he asked whether S.D.W. was at Mount Nebo and where, precisely. Gilkey testified that appellant said that S.D.W. was at Mount Nebo and could be found at one of the overlooks. Gilkey stated that S.D.W. was found almost immediately after appellant told him where the child could be found.

After the State rested its case, appellant moved for a directed verdict. Her attorney said, "I move for a directed verdict to the

offense of capital murder. I don't believe the State has met the burden of proof that she attempted to commit capital murder and she took any actions which were in the furtherance of her desire to commit capital murder or that her actions were actually for the purpose of committing capital murder." The trial court denied her motion.

Appellant then took the stand in her own defense. Appellant testified that on the day in question, she called her employer and claimed to be sick when she was actually just under a lot of stress. She testified that she went to her mother's house and asked her mother to keep S.D.W. that night but that her mother could not and there was no one else to keep him. Appellant testified that she took S.D.W., picked up a friend, and went to her former boyfriend's house to talk about a disagreement they had several months prior. The former boyfriend would not talk to her, so she left while the others stayed and watched movies. She stated that she drove around with S.D.W. She was upset, and S.D.W. was cranky. Appellant stated that she went to Mount Nebo to think and be alone. She said that she tried everything but could not get S.D.W. to stop crying. Appellant stated that she took him to the end of the lookout and sat him up on a post. She was holding his hands, but he was fussing and squirming. Appellant said that the next thing she knew, S.D.W. was not there. She insisted that he fell and that she did not throw him. Although she heard S.D.W. below, it was dark and she did not think she could get down to him, so she left the mountain. She went back to her former boyfriend's house and told him to call the police. On the stand, appellant admitted that she lied to the police but insisted that she wanted to find S.D.W. without getting herself into trouble.

Dr. Brad Diner, a psychiatrist, and Dr. Dean Whiteside, a psychologist, opined that appellant suffered from a depressive disorder but that appellant knew right from wrong. Dr. Diner testified, however, that appellant's emotional state clearly affected her thinking and behavior.

Appellant renewed her directed-verdict motion on the basis that the State had not satisfied the elements that she intended to commit the offense and that she acted purposefully. The trial court denied her motion.

Appellant argues that the trial court erred in denying her motion to suppress certain statements she made to Kimball. She contends that she had already told Kimball what happened but that

he continued to drill her. She concedes that her question concerning a lawyer was not unequivocal but that she did the best she could to convey to Kimball that she was concerned about continuing to talk to him without a lawyer present.

When reviewing a trial court's ruling on a motion to suppress, we make an independent determination based on the totality of the circumstances and will reverse the trial court's decision if it was clearly against the preponderance of the evidence. *Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003). Any conflict in the testimony of different witnesses is for the trial court to resolve. *Id.* A statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made. *Id.*

In determining whether a confession was voluntary, the following factors are considered: age, education and intelligence of the accused, lack of advice of his constitutional rights, length of detention, the repeated and prolonged nature of the questioning, or the use of physical punishment. *Standridge v. State*, 357 Ark. 105, 161 S.W.3d 815 (2004). Appellant was twenty years old, had completed high school, and could read and write. At the outset of her recorded interview, which began at 2:42 a.m. and ended at 3:10 a.m., Kimball reminded appellant of the rights she had received earlier that night and read them to her again, offering to explain anything she did not understand. Appellant indicated that she understood her rights and had not been pressured or coerced to give a statement.

A defendant may cut off questioning at any time by unequivocally invoking her right to remain silent. *Whitaker v. State*, 348 Ark. 90, 71 S.W.3d 567 (2002). When the right to remain silent is invoked, it must be "scrupulously honored." *Id.* No law enforcement officer shall question an arrested person if the person has indicated in any manner that he does not wish to be questioned, or that he wishes to consult counsel before submitting to any questioning. Ark. R. Crim. P. 4.5. A defendant may also waive an invocation of his right to silence. *Whitaker, supra.* Specifically, answering questions following a statement that attempts to invoke the right to remain silent may waive that right by implication. *Id.* The accused may change his mind and decide to talk to law enforcement officials. *Id.* An equivocal request for counsel does not obligate the police to cease questioning and seek clarification

but interrogation may continue until the suspect clearly requests counsel. *Moore v. State*, 321 Ark. 249, 903 S.W.2d 154 (1995).

Appellant said to Kimball, "Do I need a lawyer or something?" Appellant's question did not constitute an unequivocal invocation of her right to remain silent. Kimball, acting with an abundance of caution, inquired of appellant whether she was asking for a lawyer. By doing so, Kimball clearly gave appellant an opportunity to clarify whether she had indeed invoked her right to remain silent. Instead, appellant did not answer Kimball's question. Kimball testified at the suppression hearing that if appellant had answered "yes," he would have ended the interview. Under these circumstances, Kimball was not obligated to cease questioning because appellant's question, and subsequent unresponsiveness, was not sufficiently definite to invoke her right. Moreover, appellant continued answering questions and did not mention a lawyer again during the interview. Considering the totality of the circumstances, we cannot say that the trial court erred in denying appellant's motion to suppress.

Next, appellant contends that in giving information to the police as to the child's whereabouts, she abandoned her effort to commit the offense of murder. She admits that she could have been more forceful in her renunciation but maintains that she effectively conveyed the location of her son to police, despite her depressive mental state. Appellant maintains that her conviction should be reversed because she renounced her attempt to commit the offense.

A person attempts to commit an offense if he purposely engages in conduct that constitutes a substantial step in a course of conduct intended to culminate in the commission of an offense whether or not the attendant circumstances are as he believes them to be. Ark. Code Ann. § 5-3-201(a)(2) (Repl. 1997). It is an affirmative defense to a prosecution under § 5-3-201(a)(2) or (b) that the defendant abandons his efforts to commit the offense, thereby preventing its commission, under circumstances manifesting a voluntary and complete renunciation of his criminal purpose. Ark. Code Ann. § 5-3-204(a) (Repl. 1997). Once the State meets its burden of proving the elements of an offense beyond a reasonable doubt, the burden shifts to the defendant to prove an affirmative defense by a preponderance of the evidence. *Haynes v. State*, 346 Ark. 388, 58 S.W.3d 336 (2001). The question as to

which way the evidence preponderates is primarily a jury question. *See Walker v. State*, 308 Ark. 498, 825 S.W.2d 822 (1992).

■ Appellant failed to preserve her challenge to the sufficiency of the evidence because her directed-verdict motions did not address the lesser-included offense of criminal attempt to commit first-degree murder, of which she was convicted. *See Jordan v. State*, 323 Ark. 628, 917 S.W.2d 164 (1996). Because she did not question the sufficiency of the evidence for the lesser-included offense, either by name or by apprising the trial court of its elements, her argument is waived. *See id.*

■ In any event, if appellant's sufficiency argument had been preserved, we would have considered only that evidence that supported the verdict, and we would have found it to be substantial. *See Banks v. State*, 315 Ark. 666, 869 S.W.2d 700 (1994). Moreover, there was evidence to support the jury's rejection of appellant's defense. Appellant's attempt to commit first-degree murder was completed when she left her baby at Mount Nebo, which was long before her purported renunciation of the offense.

Affirmed.

ROBBINS and VAUGHT, JJ., agree.