2009 Ark. 522

**Jerry Donald SYKES, Appellant,**

v.

**STATE of Arkansas, Appellee.**

No. CR 09–402.

Supreme Court of Arkansas.

Oct. 29, 2009.

Sharon Kiel, Little Rock, for appellant.

Dustin McDaniel, Att'y Gen., by: Rachel M. Hurst, Ass't Att'y Gen., for appellee.

JIM GUNTER, Justice.

A Washington County jury convicted appellant Jerry Sykes of capital murder, kidnapping, robbery, and theft of property. He was sentenced to life in prison without the possibility of parole on the capital-murder charge, twenty years in prison on the kidnapping charge, a $10,000 fine on the robbery charge, and an $8000 fine on the theft-of-property charge. On appeal, he argues that (1) the trial court erred in denying his motion to suppress his statement on the grounds that it was unlawfully obtained, and that (2) the trial court erred in denying his motion for directed verdict with regard to the capital-murder charge.

Because appellant was convicted of capital murder and sentenced to life imprisonment without parole, our jurisdiction is pursuant to Arkansas Supreme Court Rule 1–2(a)(2). We affirm on both points.

On March 2, 2007, eleven-year-old Svana Stokes woke up late for school and realized her mother, Sandra Stokes, had slept through the alarm. When Svana went looking for her mother, she found her gagged and bound in her bed in the upstairs sleeping loft. Her mother's boyfriend, Jerry Sykes, who had been present in the house the night before, was gone. His vehicle was not parked in the driveway. Moreover, several items were missing from the home, including a laptop computer, Svana's cellular phone, Sandra's cellular phone, Sandra's purse containing credit cards and cash, and the license plate from Sandra's car. When law enforcement began searching for Sykes, they discovered a trail of ATM transactions and cellular phone communications from Oklahoma through Mexico. Following a six-month manhunt that extended into Central America, Sykes was captured and brought back to Washington County for trial.

Prior to trial, Sykes filed a motion to suppress a statement he made during a custodial interrogation on September 30, 2007. The court held a hearing on the motion on August 21, 2008. Chuck Rexford, Deputy Sheriff of the Washington County Sheriff's Office, testified that he responded to an emergency call at Stokes's home on March 2, 2007. He processed the initial crime scene, interviewed witnesses, and attempted to track down Sykes. In late September, Sykes was discovered in Honduras and brought back to Arkansas for interrogation. Rexford testified that he began the questioning session by advising Sykes of his rights and the charges against him. Rexford presented Sykes with the rights form, had him acknowledge he understood his rights, and had him sign the form. The interview was audio and video recorded. The questioning began with Sykes explaining his travels from Arkansas to Honduras. Sykes admitted taking $1500 using Sandra's ATM card. The conversation then turned to the death of Stokes.

OFFICER: Well, how about the laptop?

SYKES: Well, I tell you what Cap'n. I don't mean to be anti-social on this deal or anything like that, you know what I'm saying, but this uh, this whole thing is uh, is, is, is, really something that I pretty much already just, I already pretty well decided I'm in the story about getting down there, and all like that, I don't mind telling you, cause it's a kinda interesting story, if I say so myself, I can't believe it happened, but anyhow, and especially the part about Mexico and Mexico City about sitting in immigration for that long and them letting me go, I mean I just knew you guys had me, huh. Uh, anyhow, uh, because of the seriousness of this thing and, and, and, the price and the cost of this thing, you know, which is my life, probably twice, huh, at least, uh, I really, had rather, do anything . . .

OFFICER: Let me, let me ask you this. Well I mean, I worked the scene out there, so I know . . .

SYKES: Uh huh.

OFFICER: . . . what, what Sandy looked like and, all about the scene . . .

SYKES: Uh huh.

OFFICER: I did the crime scene. What was your intent? Just, just to get away and keep her from talking?

SYKES: Man, I'd like to tell you this, okay. I, I mean I'd like to answer this to you, I really would. You are very much onto the right track though. I'll go that far, alright. But please try to

understand, I don't, *I don't feel like that I need to be discussing this at all. I think it's really plumb ignorant to answer any questions right now, even if, I mean, can you not understand that?* I mean I . . .

OFFICER: Oh I understand that.

SYKES: . . . I am up against a fucking wall here.

OFFICER: You're, you're, right now you're, you know, you're in deep, deep trouble.

SYKES: I cert, I certainly am.

OFFICER: But that's why I was sitting here, to give you an opportunity . . .

SYKES: And it's just, it's just like, it's just like the thing with the kidnapping thing. I mean it's pretty fucking how evident that nobody was trying to kidnap her. Why, why that happened is beyond me. I will say this, okay, the intent was not there. I mean I didn't kill her and then tied her up. I actually had resuscitated her, okay. What I didn't do was I didn't, I didn't call 9–1–1, and, that's right there man how I feel now I've said a lot more than what uh, what I should have already probably said. You know what I mean. And I feel okay about that. And you've been a real good guy, I mean, and I honestly think you're a real serious profession police officer, and I don't mind really sitting here and talking to you about this, but still you know, *it says right there on that thing, anything I say can and will be used against me in a court of law, so the best I can do is, for myself, is to shut the hell up and not talk about this without first talking to a lawyer.* And I don't have the money or the funds for a lawyer. And I don't, I mean, you have a lot of expertise in the law, alright, and I'm pretty much green ass ignorant about all this stuff, okay, I mean I don't know what, but I imagine,

I imagine right now, worst case scenario on just one of those offenses, if not two of them, I could probably sit in a chair.

OFFICER: Yeah, it could go that way. That would depend on probably the prosecutor.

SYKES: I would be, I would be pretty much ignorant to assume that it's going to go any other way. You have to understand that, that's where I'm at with this, okay?

OFFICER: Sure.

SYKES: So it's not that I'm trying to be a dickhead or be uncooperative or anything like that, it's just that I'm just trying to be . . .

OFFICER: I was just trying, I was, you know, just sit you down like I would anyone else, whether it be . . .

SYKES: Well, I . . .

OFFICER: . . . to let them tell their side of the story if they wanna tell it, you know.

SYKES: . . . well . . .

OFFICER: And explain it away, or what, or try to.

SYKES: . . . a lot of those unintentional statements like that can really, you know, do damage to, I mean if, if, if my mind is anywhere near what's fair and what's right, I might be able to just get this thing, I'm thinking in the back of my head, uh, voluntary or involuntary manslaughter.

OFFICER: Okay. Well, that's that's up to the prosecutor.

SYKES: Well, well, man I understand that, but there's no, there's no point in feeding him full, you know what I'm saying, or anybody fuel, as to these accusations. I mean *right now, what I need to do is sit down and talk to a lawyer first* and, and let them, and spill my gut out to them and then whatever that lawyer sees fit to decide, uh . . .

OFFICER: Sure.

(Emphasis added.)

In a letter opinion filed October 8, 2008, the circuit court found that everything Sykes said prior to "I mean right now, what I need to do is sit down and talk to a lawyer first and, and let them, and spill my gut out to them and then whatever that lawyer sees fit to decide," was admissible, and everything following it was inadmissible because Sykes had unambiguously and unequivocally asserted his right to counsel.

Sykes's trial was held October 15–16, 2008. The State presented the testimony of Svana Stokes first. She testified that in March of 2007, she was living with her mother in Fayetteville. She stated that Sykes had lived with them off and on for two years and that he dated her mother. Stokes said that her mother was teaching Sykes to speak Spanish. She explained that the evening of March 1, 2007, was fairly typical and that when she went to bed at ten, Sykes and her mother were at home. She described the house as a small, one-bedroom with two lofts, one used for sleeping. Her bedroom was downstairs next to the backdoor, and her mother slept in the loft directly overhead.

Svana stated that she remembered waking up in the middle of the night, between one and three in the morning, but did not get out of bed. She noticed a light was on, did not hear anything, and went back to sleep. She described how she woke up the next morning at seven, realizing that she was late for school. She did not immediately notice anything unusual and went back to sleep for a few minutes. When she finally got up a few minutes later, she went looking for her mother. She climbed the ladder to the sleeping loft where her mother slept, assumed her mother was still asleep, and went back downstairs for another fifteen minutes. When she climbed the ladder a second time, she saw her mother was not breathing and noticed tape over her mouth. Svana immediately went for help but discovered that although the front door was not locked, it would not open. She testified that she did not know why she could not get out the front door. The back door was latched from the inside, which she unhooked and ran outside. She ran next door to neighbor Rex Tincher's house and told him that her mother was dead. Tincher followed Svana back to the house.

Svana testified that she became aware of several items that were missing from her house, including her mother's laptop, the license plate of her mother's car, and her mother's purse. She explained that her mother kept credit cards, social security cards, business cards, an ATM card, and a wallet in her purse. She said that her mother kept the pin number for her ATM card in her wallet as well. Svana also stated that Sykes and her mother had been fighting frequently in the two months since Sykes had been living in the home after her mother had bonded him out of jail. Svana said that the fights were about money, specifically $5000 that Sykes owed her mother. Svana stated that the night before she discovered her mother, Sykes and her mother had become "wordy" about money issues.

Rex Tincher testified that he lived next door to Sandra Stokes on March 2, 2007. He stated that he was at home when he heard a knock on the door. He did not immediately come to the door, but once he did, he saw Svana walking away, crying. He yelled to her, and she told him she thought her mother was dead. Tincher followed her to the home and went up the loft ladder to check on Sandra. He stated that it was dark and hard to see in the loft, but he noticed her head was toward the foot of the bed, and she was partly covered

by a blanket. Once his eyes adjusted to the dark, he noticed the duct tape on her mouth, that she was not breathing even though her nose was not covered, and that her hands were taped behind her back. Tincher called 911 and waited with Svana until authorities arrived. He acknowledged that he had seen Sykes "hanging around" Stokes's home.

Washington County Deputy Sheriff Chuck Rexford testified that he found the victim in the upstairs sleeping loft, lying on her right side with her head toward the ladder. Her hands were bound together behind her back with duct tape, and her ankles were also wrapped tightly with duct tape and taped to her hands in a "hog tie" fashion. She had duct tape covering her mouth but not her nose. He described the ladder to the loft as "make shift." Rexford went into detail about the collection of evidence from the home, including the finding of a partial roll of duct tape in a wooded area near the home.

After discovering the deceased in the sleeping loft, Rexford began looking for Sykes as a person of interest. Rexford testified that Stokes had cosigned a bail bond for Sykes shortly before her death, that Sykes had been at the home the night before she was discovered, that Sykes's vehicle was missing on the morning of March 2, and that several items of property were missing from Stokes's home. Of the items missing, several were ATM bank cards or credit cards in the name of Sandra Stokes. Law enforcement informed the banks that the cards were missing and were alerted that someone had attempted to use the ATM card in several locations in Arkansas and Oklahoma. Phone records showed that someone was using Svana's cellular phone in the hours after Stokes's death. Rexford explained that the U.S. Marshal Service was brought in to assist and that it was eventually discovered that

Sykes had crossed the border into Mexico. The investigation and search went on for several months, until the authorities were able to locate Sykes via credit card charges in Honduras. Rexford testified that Sykes was taken into custody in Honduras, transferred to Houston, and then picked up and flown back to northwest Arkansas for interrogation and DNA testing.

Medical examiner Adam Craig testified regarding the injuries to the victim, explaining that the cause of death was asphyxia due to the binding of extremities and external airway obstruction. Craig stated that the duct tape covering Stokes's mouth partially obstructed her ability to breathe and that her arms were tied so tightly around her back so that her chest was constricted in such a way as to prevent her from getting enough oxygen. Although there was no complete occlusion of the airways, Craig stated that the bindings and covering of her mouth caused the death by asphyxiation. He was unable to determine an approximate time of death. He also stated that he took samples of Stokes's fingernails for the lab.

Two employees of the Arkansas State Crime Lab explained that Sykes's DNA was found under Stokes's fingernails. Both stated that such a transfer would require more than casual contact—such as shaking hands or patting a person on the back. However, both admitted that there were various ways to transfer DNA, such as a vigorous back massage or scratching.

Arvest Bank security manager, Terry Hendrix, testified that the following activity occurred on Stokes's bank account on March 2:(1) a $500 ATM withdrawal was made in Siloam Springs at a bank located at 3370 East Highway 412; (2) a $200 withdrawal was made at that same location; (3) another $500 withdrawal was made at 2730 Highway 412 East in Siloam

Springs; (4) another $200 withdrawal was made at 2730 Highway 412 East; and (5) a $100 withdrawal was made at the EZ Go on the Cherokee Turnpike in Oklahoma. The total amount withdrawn from Stokes's account that day was $1500, the maximum allowed by Arvest in a twenty-four-hour period for that type of an account. Hendrix testified that three unsuccessful attempts to use the victim's ATM card were made around six o'clock in the morning on March 2, 2007, in Tonitown. Those withdrawals were not successful because the PIN number entered was invalid. Hendrix explained that video-recording surveillance systems at the banks in Tonitown and Siloam Springs recorded the person attempting the transactions. The State introduced eight photographs of the individual making or attempting to make the ATM transaction using Stokes's card.

An AT & T Wireless employee testified that cellular phone records indicated that several calls were made from a cellular phone assigned to Stokes between March 2 and March 4, 2007, including calls from the Laredo, Texas, area on March 3 and March 4 and calls from Nuevo Laredo, Mexico, on March 4.

Deputy Sheriff Chuck Rexford was re-called to testify regarding his interview of Sykes. In accordance with the circuit court's earlier ruling, the State introduced, over defense counsel's renewed objection, the partial recording and transcription of Sykes's interview.

At the close of the State's case, defense counsel made a motion for directed verdict arguing that the capital-murder charge should be dismissed because the State failed to prove that Sykes caused Stokes's death under circumstances manifesting extreme indifference to the value of human life. Specifically, Sykes maintained that he should not be charged with capital murder where Stokes's death was not the natural consequence of his action but rather was an "unfortunate side effect of being bound." He contended that his actions were not to "purposefully" cause the death of Stokes. Furthermore, he asserted that because there was no evidence of struggle or external wounds, Stokes must have consented to being tied up. Sykes renewed his motion prior to the submission of the case to the jury and again following the verdict and prior to sentencing. Sykes filed a timely notice of appeal from the judgment and commitment order.

Appellant maintains that the trial court erred in denying his motions for directed verdict on the capital-murder charge. Although appellant makes his sufficiency argument as his second point on appeal, we must address it first due to double-jeopardy concerns. *Adams v. State*, 2009 Ark. 375, 326 S.W.3d 764. We treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *Gilcrease v. State*, 2009 Ark. 298, 318 S.W.3d 70. In reviewing a challenge to the sufficiency of the evidence, this court views the evidence in a light most favorable to the State and considers only the evidence that supports the verdict. *Id.* Substantial evidence is that evidence which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Id.* Credibility of witnesses is an issue for the jury and not the court, and the jury is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Price v. State*, 373 Ark. 435, 284 S.W.3d 462 (2008).

On appeal, appellant claims that the State failed to prove that he caused the death of Stokes under circumstances manifesting extreme indifference to the value of human life. He asserts that the State

failed to prove that he intended for the victim to die; that her death was not just an "unfortunate side effect of being bound;" that because there was no sign of struggle, the evidence supported a finding that she consented to being tied up; and that her death was not the "natural, probable result" of being bound.

A person commits capital murder if he commits or attempts to commit kidnapping or robbery and, in the course of and in furtherance of the felony or in immediate flight therefrom, he causes the death of a person under circumstances manifesting extreme indifference to the value of human life. Ark.Code Ann. § 5–10–101(a)(1) (Supp.2009). In *Price v. State*, this court explained that

> [we have] consistently defined circumstances manifesting extreme indifference to the value of human life as deliberate conduct that culminates in the death of another person. We have also stated that extreme indifference requires actions that evidence a mental state on the part of the accused to engage in some life-threatening activity against the victim.

373 Ark. at 439, 284 S.W.3d at 465–66 (citations omitted). The language "under circumstances manifesting extreme indifference to the value of human life" does not add an additional mens rea element to felony murder. *Perry v. State*, 371 Ark. 170, 264 S.W.3d 498 (2007). The sole mens rea element in capital-felony murder relates to the underlying felony and not to the homicide itself. *Id.* The "extreme indifference" element is not a culpable mental state relating to a specific homicide victim but merely describes the dangerous circumstances generally set in motion by the defendant. *Id.*

Appellant's sufficiency argument has no merit. The record demonstrates that he "hog-tied" Stokes with duct tape constrict-ing her hands and feet tightly behind her back; covered her mouth with duct tape; left her alone in a sleeping loft accessible only by a make-shift ladder; took her purse, wallet, cell phone, and other personal belongings; withdrew $1500 from her bank account; and fled to Central America. The medical examiner testified that Stokes's death was caused by asphyxiation due to the binding of her extremities and mouth. Appellant admitted during interrogation that he should have called 911 after he attempted to resuscitate her, which suggests that Stokes began struggling to breathe prior to Sykes leaving the home. Our law does not require the State to prove appellant intended for Stokes to die, rather it only requires proof that he caused her death by setting into motion dangerous circumstances in furtherance of the commission of a robbery or kidnapping. Here, there was sufficient evidence to show that appellant bound and robbed the victim, that he left her alone in the loft and fled, and that her death was a result of being bound. Appellant clearly intended to restrict Stokes's ability to breathe and abandon her in a perilous position, which culminated in her death. There was sufficient evidence to prove appellant deliberately engaged in life-threatening behavior. Thus, the trial court did not err in denying his directed-verdict motion.

Appellant also argues that the trial court should have suppressed the entire custodial statement appellant made to Deputy Sheriff Rexford. Appellant contends that the officer continued to interrogate him after he had invoked his right to remain silent and his right to counsel in violation of his Fifth and Sixth Amendment rights as illustrated in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), as well as his analogous state guarantees under article 2, §§ 8 and 10 of the Arkansas Constitution.

When reviewing the denial of a motion to suppress evidence, this court conducts a de novo review based upon the totality of the circumstances, reversing only if the circuit court's ruling is clearly against the preponderance of the evidence. *Morgan v. State,* 2009 Ark. 257, 308 S.W.3d 147.

The issue presented in this case is whether appellant made an unequivocal request for an attorney and unambiguously invoked his right to remain silent. A statement made while an accused is in custody is presumptively involuntary, and the burden is on the State to prove, by a preponderance of the evidence, that a custodial statement was given voluntarily and was knowingly and intelligently made. *Whitaker v. State,* 348 Ark. 90, 71 S.W.3d 567 (2002). A defendant may cut off questioning at any time by unequivocally invoking his right to remain silent. *Id.* When the right to remain silent is invoked, it must be "scrupulously honored." *Miranda,* 384 U.S. at 479, 86 S.Ct. 1602. Our criminal rules provide that a police officer shall not question an arrested person if that person indicates "in any manner" that he does not wish to be questioned or that he wishes to consult counsel before submitting to any questioning. Ark. R.Crim. P. 4.5 (2009).

When invoking a *Miranda* right, the accused must be unambiguous and unequivocal. *Whitaker,* 348 Ark. at 97, 71 S.W.3d at 572. Furthermore, if a suspect makes a reference to an attorney that is ambiguous or equivocal such that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require cessation of questioning. *Higgins v. State,* 317 Ark. 555, 879 S.W.2d 424 (1994). An equivocal request for counsel does not obligate the police to cease questioning and seek clarification, but interrogation may continue until the suspect clearly requests counsel. *Moore v. State,* 321 Ark. 249, 903 S.W.2d 154 (1995).

There is no distinction between the right to counsel and the right to remain silent with respect to the manner in which they are effected. *Standridge v. State,* 329 Ark. 473, 951 S.W.2d 299 (1997). Both must be unambiguously and unequivocally invoked. *Whitaker,* 348 Ark. at 97, 71 S.W.3d at 572. The right to remain silent must be made unequivocally, and answering questions following a statement that attempts to invoke the right to remain silent may waive that right by implication. *Standridge,* 329 Ark. at 479, 951 S.W.2d at 301.

In *Standridge,* this court held that a defendant's statement that "I ain't ready to talk" was not a clear invocation of his right to remain silent where the defendant continued to talk and answer questions. *Id.* at 479, 951 S.W.2d at 301–02. In *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the court held that a defendant's statement to the interrogating officer that "maybe I should talk to a lawyer" was not sufficient to invoke the right to counsel, a holding with which we have indicated agreement. *Wallace v. State,* 2009 Ark. 90, 302 S.W.3d 580; *see also Flanagan v. State,* 368 Ark. 143, 243 S.W.3d 866 (2006) (holding that defendant's question "Do I need to call an attorney?" was not a clear invocation of the right to counsel); *Higgins,* 317 Ark. at 557, 879 S.W.2d at 425 (same holding for "Do you think I need a lawyer?").

Here, the circuit court found that appellant's statement that "right now, what I need to do is sit down and talk to a lawyer first," was a clear statement that he wished to have counsel. The trial court suppressed appellant's statement from that point forward. Therefore, we need

only consider whether anything appellant said prior to that clearly indicated he wished to invoke his constitutional rights. His early comments include: "I don't feel like that I need to be discussing this at all," "I think it's really plumb ignorant to answer any questions right now," and "the best thing I can do is, for myself, is to shut the hell up and not talk about this without first talking to a lawyer." None of these statements unambiguously and unequivocally indicate a right to remain silent or a right to counsel. In reviewing the entire conversation, it is clear that appellant was conscious of his Miranda rights and that he continued to talk to the officer and answer his questions even though he knew it was against his best interest. In fact, after each statement regarding counsel or whether appellant should be discussing the details of what happened, appellant continued the conversation. A reasonable officer in the situation would not have understood that appellant was clearly and unequivocally invoking his right to remain silent or his right to an attorney. Consequently, there was no error in allowing the indicated portions of the custodial statement.

Pursuant to Arkansas Supreme Court Rule 4–3(i), this court has reviewed the abstract, addendum, and record for all adverse rulings on objections, motions, and requests made by either party. No reversible error has been found.

Affirmed.