

Cite as 2013 Ark. 505

# SUPREME COURT OF ARKANSAS

No. CR–12–933

| | |
|---|---|
| BRANDON CLARK FRITTS<br><br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br><br>APPELLEE | **Opinion Delivered** DECEMBER 12, 2013<br><br>APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, FORT SMITH DISTRICT<br><br>[NO. CR-2012-113]<br><br>HONORABLE JAMES O. COX, JUDGE<br><br>AFFIRMED. |

**DONALD L. CORBIN, Associate Justice**

Appellant Brandon Clark Fritts appeals the order of the Sebastian County Circuit Court convicting him of first-degree murder and sentencing him, as a habitual offender, to life imprisonment. Appellant's sole argument on appeal is that the circuit court erred in denying his motion to suppress an incriminating statement that he made after invoking his right to remain silent. Our jurisdiction is pursuant to Arkansas Supreme Court Rule 1–2(a)(2) (2013). We find no error and affirm.

Because Appellant does not challenge the sufficiency of the evidence against him, a brief recitation of the facts is all that is necessary. The record reflects that on January 3, 2012, a person called the Fort Smith Police Department to report seeing a dead body in an alley near South 17th and Q streets. Police responded and discovered the body of Jamie Lee Czeck,

who had been shot multiple times. Police also discovered the victim's cell phone and several 9 mm shell casings in the immediate area of the body.

During the course of the investigation, police questioned Appellant as a possible witness because he was one of the last people seen with Czeck. This interview occurred on January 5, 2012, and Appellant denied knowing anything about the death of the victim and stated that the last time he saw him, Czeck was alive and well. Later that same day, police again questioned Appellant after cell-phone records obtained by authorities contradicted statements made by Appellant.

As the investigation continued, authorities developed Appellant as a suspect. At that time, Appellant and his girlfriend, Charitie Clawson, were being held in the Sequoyah County jail in Oklahoma on drug charges. Officers from the Fort Smith Police Department traveled to Oklahoma to interview Clawson and Appellant. Clawson led police to the murder weapon and made statements implicating Appellant. During a subsequent interview with Fort Smith detectives, Appellant admitted that he shot Czeck but denied that it had anything to do with the Aryan Circle. According to the affidavit for warrant of arrest completed by Fort Smith Police Detective Jeff Carter, Appellant stated that Czeck "would not shut up and would not stay where he was supposed to stay." Appellant admitted that he shot Czeck one time in the face, several times in the chest, and one last time in the back of the head "for good measure."

Fort Smith police subsequently issued a warrant for Appellant's arrest, and Appellant was returned to Arkansas. During his transport from Sequoyah County to Fort Smith,

Appellant began talking to the officers about the murder and denied that it had anything to do with the Aryan Circle and insisted that it was just a personal matter. During a subsequent formal interview at the Fort Smith Police Department, Appellant, after being advised of his *Miranda* rights, again confessed to the murder.

Appellant was charged by felony information with one count of murder in the first degree in violation of Arkansas Code Annotated § 5-10-102 and being a habitual offender in violation of Arkansas Code Annotated § 5-4-501. The State subsequently filed an amended information to include one count of felon in possession of a firearm in violation of Arkansas Code Annotated § 5-73-103. Prior to trial, Appellant filed three separate motions to suppress, seeking to suppress statements he made to officers on January 30 and February 2, as well as suppression of evidence related to the location of his phone, and his subsequent statements, which he argued were fruit of the poisonous tree.

A suppression hearing was held on June 5, 2012. Officer Eric Helms, an investigator with the Sequoyah County Sheriff's Department, testified that officers with his department obtained a consent to search the home of Michael Weatherton, Appellant's father, after Fort Smith investigators learned from Charitie Clawson that Appellant had hidden a gun at his father's house. The officers went to the residence of Mike Weatherton on January 30, 2012, and obtained his consent to search the premises. As a result of this search, officers found a black gun box that contained a Glock 9 mm semiautomatic pistol, two Glock 9 mm magazines, and one speed loader. The gun box and its contents were located in the garage under an upright freezer.

SLIP OPINION

Detective Carter testified about his work on the homicide of Jamie Czeck. He stated that early in the investigation he learned that Appellant was one of the last people seen with the victim before his death. Detective Carter stated that he initially interviewed Appellant as a witness to the murder but subsequently developed him as a suspect. Detective Carter traveled to Sallisaw, Oklahoma, after learning that Appellant and Clawson were being held in the Sequoyah County jail. According to Detective Carter, he spoke with Clawson first and she stated that Appellant was angry with Czeck because Czeck was going to "lay down his patch and ride with the Hell's Angels." Clawson also told the officers that she knew Appellant was going to kill Czeck and that she was with Appellant when he went to his father's house in Sallisaw, Oklahoma, and hid the murder weapon under a freezer in the garage.

After officers located the gun, Detective Carter returned to the jail to talk with Appellant. Carter stated that he told Appellant that he knew the truth and wanted his side of the story. Appellant responded that he had told Detective Carter all he knew on January the 5th. According to Detective Carter, he did not end the interview at this point because Appellant stated that he would answer Carter's questions. Detective Carter then told Appellant that they had recovered the murder weapon and showed the gun to him. In response, Appellant stated that if Carter would let him have a cigarette, he would talk to him.

After allowing Appellant to smoke a cigarette, Detective Carter advised Appellant of his *Miranda* rights and began taping his interview of Appellant. At the beginning of the tape-recorded interview, Appellant stated that he had said everything he was going to say but that



he would answer the officers' questions. Appellant initially denied any involvement in Czeck's murder but ultimately confessed to the crime.

Detective Kyle Story of the Fort Smith Police Department testified that he and Detective Adam Creek traveled to the Sequoyah County jail on February 2, 2012, to pick up Appellant after a warrant was issued for his arrest in connection with the Czeck murder. Detective Story stated that he did not read Appellant his *Miranda* rights until they returned to Fort Smith, but denied questioning him about the crime. According to Detective Story, during the drive back to Fort Smith, he asked Appellant about a letter that involved the Aryan Circle and also asked Appellant if he and the victim were involved in the Aryan Circle. Detective Story commented that it sounded like Appellant was taking care of business for the Aryan Circle, to which Appellant replied he did not want to talk anymore. Upon returning to Fort Smith, Detectives Story and Creek Mirandized Appellant, who stated that he understood his rights and agreed to talk to the officers.

Detective Creek also testified at the suppression hearing and stated that neither officer advised Appellant of his *Miranda* rights at the time that they picked him up, but that they did not ask him any questions other than some questions about how he was treated while in jail and then about a letter concerning the Aryan Circle that had been sent from prison. Then, according to Detective Creek, Appellant began telling the officers about the murder and denied that it had anything to do with the Aryan Circle. Detective Creek also testified that the officers advised Appellant of his *Miranda* rights once they returned to Fort Smith, and

SLIP OPINION

Appellant signed the rights form, indicating that he understood those rights. Thereafter, Appellant admitted that he was the one who had murdered Czeck.

At the close of the hearing on the suppression motions, Appellant argued that the court should suppress the incriminating statements he made on January 30 because he indicated to the officers that he did not want to speak with them when he told Detective Story that he had already told him everything he knew. Appellant further argued that even if that initial statement did not constitute a *Miranda* violation, later when he told officers during the video-recorded interview that "[t]hat's all I got to say," this statement was another attempt by Appellant to stop the interrogation. Appellant also argued that the statements should be suppressed because they were not made voluntarily and were the fruit of the poisonous tree based on the officers' impermissible intrusion into Appellant's phone records to ascertain the location of his phone.[1]

The circuit court denied each of the motions to suppress. Thereafter, Appellant was tried before a jury and convicted as previously set forth. This appeal followed.

Appellant's sole argument on appeal is that the circuit court erred in denying his motion to suppress a statement he made to officers on January 30, 2012, while he was being held in the Sequoyah County jail in Oklahoma. According to Appellant, Detective Carter came to the jail to question him, and Appellant's response that he had already told him everything he knew was a clear indication that he had nothing further to say. Thus, when

---

[1]Appellant raises no arguments on appeal related to the other motions to suppress that were denied by the circuit court.

SLIP OPINION

Detective Carter then showed him the murder weapon, prompting Appellant to say he would talk to police if he were allowed to first smoke a cigarette, this was the functional equivalent of Carter further questioning him after Appellant invoked his right to remain silent. The State counters that the circuit court properly denied the motion to suppress.[2]

This court reviews a circuit court's decision denying a defendant's motion to suppress a confession by making an independent determination based on the totality of the circumstances, and the ruling will be reversed only if it is clearly against the preponderance of the evidence. *Williamson v. State*, 2013 Ark. 347, ___ S.W.3d ___. Conflicts in testimony at a suppression hearing about the circumstances surrounding a defendant's in-custody statement are for the trial judge to resolve. *Id.*

A statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily. *Bryant v. State*, 2010 Ark. 7, 377 S.W.3d 152. A person subject to a custodial interrogation must first be informed of his right to remain silent and right to counsel pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). *See id.* A defendant may cut off questioning at any time by unequivocally invoking his right to remain silent. *Michigan v. Mosley*, 423 U.S. 96 (1975); *see also Whitaker v. State*, 348 Ark. 90, 71 S.W.3d 567 (2002). Our criminal rules

---

[2]On appeal, the State points out that the instant case involves a purported invocation of the right to remain silent before officers provided the *Miranda* warnings. Because Appellant's argument, both below and on appeal, simply focuses on the issue of whether his statement was an unequivocal invocation of his right to remain silent that should have caused officers to stop all questioning, our review of the issue will be so limited.

SLIP OPINION

similarly provide that a police officer shall not question an arrested person if that person indicates "in any manner" that he does not wish to be questioned. Ark. R. Crim. P. 4.5 (2013). Notably, the Supreme Court further explained that "interrogation" not only includes express questioning, but also its functional equivalent. *Rhode Island v. Innis*, 446 U.S. 291 (1980). According to the Court, the functional equivalent of questioning is any statement or conduct which the police should know is "reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301 (footnote omitted).

When the right to remain silent is invoked, it must be "scrupulously honored." *Miranda*, 384 U.S. at 479; *Whitaker*, 348 Ark. at 95, 71 S.W.3d at 570; *see also Robinson v. State*, 373 Ark. 305, 309, 283 S.W.3d 558, 561 (2008). The meaning of "scrupulously honored" was discussed in *James v. Arizona*, 469 U.S. 990, 992–93 (1984):

> To ensure that officials scrupulously honor this right, we have established in *Edwards v. Arizona*, [451 U.S. 477 (1981)], and *Oregon v. Bradshaw*, [462 U.S. 1039 (1983)], the stringent rule that an accused who has invoked his Fifth Amendment right to assistance of counsel cannot be subject to official custodial interrogation unless and until the accused (1) "initiates" further discussions relating to the investigation, and (2) makes a knowing and intelligent waiver of the right to counsel under the standard of *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938), and its progeny. *See Solem v. Stumes*, 465 U.S. 638 (1984).

Since the decision in *Miranda*, the United States Supreme Court has held that when invoking a *Miranda* right, the accused must be unambiguous and unequivocal. *Davis v. United States*, 512 U.S. 452 (1994). With regard to a suspect invoking the right to counsel, the Court has said:

> [H]e must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be


a request for an attorney. If the statement fails to meet the requisite level of clarity, [the law] does not require that the officers stop questioning the suspect.

*Id.* at 459. This court has held that there is no distinction between the right to counsel and the right to remain silent with respect to the manner in which they are effected. *Standridge v. State*, 329 Ark. 473, 951 S.W.2d 299 (1997); *Bowen v. State*, 322 Ark. 483, 911 S.W.2d 555 (1995). Both must be unambiguously and unequivocally invoked. *Whitaker*, 348 Ark. 90, 71 S.W.3d 567. This court has held, however, that the right to remain silent must be made unequivocally, but answering questions following a statement that attempts to invoke the right to remain silent may waive that right by implication. *Bowen*, 322 Ark. 483, 911 S.W.2d 555. In other words, an accused may change his mind and decide to talk to law enforcement officials. *Willett v. State*, 322 Ark. 613, 911 S.W.2d 937 (1995) (citing *Michigan v. Jackson*, 475 U.S. 625 (1986)).

More recently, the Supreme Court has addressed this issue of whether a person's silence constitutes an unequivocal invocation of his *Miranda* rights, and explained as follows:

> The Court has not yet stated whether an invocation of the right to remain silent can be ambiguous or equivocal, but there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*. Both protect the privilege against compulsory self-incrimination, by requiring an interrogation to cease when either right is invoked.

> There is good reason to require an accused who wants to invoke his or her right to remain silent to do so unambiguously. A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that "avoid[s] difficulties of proof and . . . provide[s] guidance to officers" on how to proceed in the face of ambiguity. If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression "if they guess wrong."

> Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity. Treating an ambiguous or equivocal act, omission, or statement as an invocation of *Miranda* rights "might add marginally to *Miranda's* goal of dispelling the compulsion inherent in custodial interrogation." But "as *Miranda* holds, full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process."

*Berghuis v. Thompkins*, 560 U.S. 370 (2010) (citations omitted). Thus, the Court concluded that where the suspect did not say that he wanted to remain silent or that he did not want to talk with the police, there was no unequivocal invocation of his *Miranda* right. *Id.* Thus, both our court and the United States Supreme Court have made clear that an invocation of a right to remain silent must be unequivocal and unambiguous.

With this in mind, we turn to Appellant's argument that his statement was an unequivocal invocation of his right to remain silent and that his rights were violated when Detective Carter subsequently engaged in the functional equivalent of questioning him by showing him the murder weapon. The record reflects that Detective Carter visited Appellant in the Sequoyah County jail after officers retrieved the gun, which Charitie Clawson stated was the murder weapon. Detective Carter testified at the suppression hearing that he informed Appellant that the police knew the truth about the murder of Czeck and wanted to get Appellant's side of the story. His testimony further revealed that Appellant responded that he had told Detective Carter all he knew on January the 5th. It is this statement that Appellant claims was his unequivocal invocation of his right to remain silent. We simply cannot agree.


This court has held that a suspect's series of "no's" followed by an "[h]uh–uh" and a subsequent statement that "I don't want to talk about it," in response to attempted police questioning evidenced her unequivocal invocation of the right to remain silent. *Whitaker*, 348 Ark. at 96–97, 71 S.W.3d at 571. In so ruling, this court explained that the word "no" certainly demonstrated a desire not to speak and was in no way an equivocal answer. *Id.* This decision may be contrasted with the court's decision in *Standridge*, 329 Ark. at 478, 951 S.W.2d at 301, where this court held that a suspect's statement that "I ain't ready to talk" was not an unequivocal invocation of his right to remain silent when the defendant continued to talk and answer questions. Likewise, this court held in *Bowen*, 322 Ark. at 504, 911 S.W.2d at 564, that the statement that the accused wanted to "think about" whether to waive his rights and make a statement was not sufficiently definite. This court also rejected the notion that a suspect's statement that "Okay, then we're through with this interview then" was an unequivocal invocation of the right to remain silent. *Bryant*, 2010 Ark. 7, at 15, 377 S.W.3d at 161. Finally, in *Sykes v. State*, 2009 Ark. 522, 357 S.W.3d 882, this court held that comments such as, "I don't feel like that I need to be discussing this at all," "I think it's really plumb ignorant to answer any questions right now," and "the best thing I can do is, for myself, is to shut the hell up and not talk about this without first talking to a lawyer" did not unambiguously and unequivocally indicate a right to remain silent or a right to counsel. In so ruling, this court noted as follows:

> In reviewing the entire conversation, it is clear that appellant was conscious of his *Miranda* rights and that he continued to talk to the officer and answer his questions even though he knew it was against his best interest. In fact, after each statement

SLIP OPINION

regarding counsel or whether appellant should be discussing the details of what happened, appellant continued the conversation. A reasonable officer in the situation would not have understood that appellant was clearly and unequivocally invoking his right to remain silent or his right to an attorney.

*Id.* at 15, 357 S.W.3d at 891.

Here, like the aforementioned cases, we simply cannot say that Appellant's statement that he had already told officers all that he knew was an unambiguous and unequivocal invocation of his right to remain silent. A statement that you had already told officers everything you know in no way indicated an unwillingness to answer further questions. At best, it put the officers on notice that Appellant had no new information to share with them. Accordingly, we cannot say that the circuit court erred in denying Appellant's motion to suppress. Having so determined, it is unnecessary for us to consider Appellant's contention that Detective Carter's showing him the murder weapon was the functional equivalent of continued questioning.

Pursuant to Arkansas Supreme Court Rule 4–3(i) (2013), the record has been reviewed for all objections, motions, and requests that were decided adversely to Appellant, and no prejudicial error has been found.

Affirmed.

*Brimhall Law Firm, PLLC*, by: *Douglas Brimhall*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.